IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03388-KLM

AMBROSE CRUZ,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
HEATHER R. JOSSI, #07059, and
KEITH VALENTINE,

     Defendants.

_____

**ORDER**

_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on Plaintiff's **Motion to Limit Expert Opinion Testimony Pursuant to Federal Rule of Evidence 702 and *Daubert*** [#90] (the "Motion"). Defendants filed a Response [#96] in opposition to the Motion [#90], and Plaintiff filed a Reply [#100]. The Court has reviewed the briefs, the entire case file and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#90] is **GRANTED in part and DENIED in part**.[1]

**I.   Background**

---

[1] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#12, #14, #107].

Plaintiff is a freelance journalist and photographer and a resident of Denver, Colorado. *Am. Compl.* [#27] ¶ 14. Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. *Id.* ¶ 15. The Denver Police Department ("DPD") is an agency of Defendant Denver. *Id.* Defendants Heather R. Jossi ("Jossi") and Keith Valentine ("Valentine") were at all relevant times officers of the DPD. *Id.* ¶¶ 23, 24.

In the wake of George Floyd's death in Minneapolis, Minnesota at the hands of police officers, protests took place across the country. *Id.* ¶ 1. Plaintiff attended a protest in Denver, Colorado on June 1, 2020, gathering with other protestors at the Capitol Building around 8:00 p.m. *Id.* ¶¶ 73, 75. After 9:00 p.m., DPD officers began shooting foam batons, rubber bullets, and tear gas at the protestors, allegedly without warning. *Id.* ¶ 76.

In an effort to escape the tear gas, Plaintiff ran into a parking garage located at 13th Avenue and Lincoln Street but soon discovered that there was no viable exit. *Id.* ¶¶ 81-82. DPD officers ran after him. *Id.* ¶ 81. Plaintiff alleges that as he ran up the stairs of the garage, Defendant Valentine shot him in the face with PepperBall projectiles at close range.[2] *Id.* ¶ 83. Plaintiff alleges that Defendant Valentine hit him three times in the eye area. *Id.* Plaintiff states that he then put his hands up and laid down, unresisting. *Id.* ¶ 84. Plaintiff alleges that Defendant Valentine continued to fire PepperBalls at him while he was on the ground. *Id.* ¶ 86. Plaintiff was arrested for

---

[2] A PepperBall projectile is filled with oleoresin capsicum, known as "OC powder", an active ingredient in pepper spray which has an immediate incapacitating effect creating a burning sensation on skin and causing a person to struggle to breathe. *Am. Compl.* [#27] ¶¶ 35, 46, 47.

curfew violation and failure to obey lawful order, charges which were later dismissed.   *Id.* ¶¶ 105, 109.

Following his encounter with Defendants, Plaintiff's eye was bleeding, swollen shut, and bruised, and he could not open his eye.   *Id.* ¶ 101.   Plaintiff asserts that he continues to have problems with his eyesight, including light sensitivity.   *Id.* ¶ 104. Following his arrest, Plaintiff was detained in jail where he claims that he did not receive medical attention for at least twelve hours.   *Id.* ¶¶ 107, 108.

In the instant Motion [#90], Plaintiff asks the Court to exclude certain testimony of Christopher Gard ("Gard"), Defendants' proffered police practices expert.   *Motion* [#90] at 1.   Mr. Gard is a retired law enforcement officer who is currently employed as a consultant for Force Science, LTD, where he is a certified Force Science Advanced Specialist.   *See Curriculum Vitae of Gard* [#90-3] at 2-4.   In this role, Mr. Gard assists clients in identifying and understanding police practices as they relate to police use-of-force encounters, policy, and training.   *Gard Report* [#90-1] at 4.

In preparation for his testimony, Mr. Gard reviewed Plaintiff's original Complaint [#1], Plaintiff's Amended Complaint [#27], Defendants' Answers [#35, #36, #42], Defendants' Motion for Summary Judgment [#59], twenty-six DPD records including training documents and officer files, and Plaintiff's medical records and reports.   *Gard Report* [#90-1] at 26.   Mr. Gard estimates that he spent approximately twenty-two hours on this case, including eight hours specifically writing his report.   *Depo. of Gard* [#90-2] at 34:7-8, 23.   Mr. Gard was asked to review and analyze "police practices, policy, and threat assessments as it [sic] relates to Officer Jossi, Officer Valentine, and Officer Doe's

duties and performance on June 2nd, 2020."[3]   *Gard Report* [#90-1] at 2.   After reviewing the records provided to him, Mr. Gard prepared a report explaining his findings.   *See generally Gard Report* [#90-1].   In his report, Mr. Gard formed several opinions, including that: (1) during the course of Plaintiff's arrest, the Defendant Officers' threat assessment and responses were reasonable and consistent with generally accepted police practices; (2) the Defendant Officers' use of force, including the deployment of PepperBall projectiles, was reasonable and consistent with generally accepted police practices; and (3) Plaintiff's eye injury is inconsistent with an injury sustained from a PepperBall projectile.   *Id.* at 17-23.

In his Motion [#90], Plaintiff argues that: (1) Mr. Gard is unqualified to opine on appropriate use of force in this case; (2) Mr. Gard is unqualified to opine on the appropriate use of PepperBall projectiles; (3) Mr. Gard is unqualified to opine on the source of Plaintiff's eye injury; (4) Mr. Gard usurps the jury's fact-finding function; and (5) the opinions offered by Mr. Gard, specifically relating to any threat posed by Plaintiff, are speculative.   *Motion* [#90] at 3-11; *see also Reply* [#100] at 2-7.   Additionally, Plaintiff argues that Mr. Gard uses boilerplate language in his report which is not relevant and has no bearing on this case.   *Id.* at 12.   In their Response [#96], Defendants argue that, because of his twenty-six-year career in law enforcement and the experience and knowledge that experience affords him, Mr. Gard is qualified to form opinions regarding the use of force and use of PepperBall projectiles in this case.   *Response* [#96] at 4-8.

---

[3]   The Court notes that Plaintiff's original Complaint [#1] listed Defendant "Doe DPD Officer".   *Compl.* [#1] at 1.   This was amended in Plaintiff's Amended Complaint [#27] to Defendant Valentine.   *Am. Compl.* [#27] at 1.   No unknown DPD officers are currently parties in this action.   *See generally Am. Compl.* [#27].

Defendants further argue that Mr. Gard's opinion regarding the cause of Plaintiff's eye injury was formed based on consideration of the evidence "from the perspective of a police practices expert, rather than as a medical expert" and is therefore within the scope of his expertise.   *Id.* at 8-9.   Finally, Defendants argue that Mr. Gard's opinion regarding any potential threat Plaintiff posed is not speculative and instead is grounded in his application of threat assessments and that Plaintiff's argument regarding Mr. Gard's use of boilerplate language is premature.   *Id.* at 11-14.

## II.   Standard of Review

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Based on this rule, admission at trial of expert testimony requires a two-step analysis. *103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).   "First, the court must determine whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion."   *Id.* (citation omitted).   "Second, if the expert is sufficiently qualified, the court must determine whether the opinion is reliable under the principles set forth in *Daubert*."   *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).

The Court has a "gatekeeping role" in deciding whether to admit or exclude expert testimony and must determine that the testimony is both reliable and relevant.   *Daubert*,

509 U.S. at 589, 597.   An opinion is reliable if the reasoning or methodology of the expert is valid and "can be applied to the facts in issue."   *Id.* at 592.   When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can [be] and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."   *103 Invs. I, L.P.*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94).   These considerations are not exhaustive.   Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."   *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).   Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field."   *Id.*   An opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."   *Id.*

Ultimately, the determination of whether expert testimony should be admitted is within the sound discretion of the trial court.   *Vining v. Enter. Fin. Grp.*, 148 F.3d 1206, 1218 (10th Cir. 1998).   "[T]he rejection of expert testimony is the exception rather than the rule."   *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 922 (D. Colo. 2017) (quoting Fed. R. Evid. 702 advisory committee's note).   "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system . . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."   *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, its proffer is tested against the standard of reliability, not correctness; a proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied."   *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

### III.   Analysis

In his Motion [#90], Plaintiff argues several grounds on which Mr. Gard's opinions regarding police practices should be excluded: (1) Mr. Gard is unqualified to opine on the appropriate use of force under the circumstances presented in this case; (2) Mr. Gard is unqualified to testify on the appropriate use of PepperBall projectiles; (3) Mr. Gard is unqualified to testify about the kind of injury that a PepperBall would cause; (4) Mr. Gard usurps the jury's fact-finding function; and (5) Mr. Gard relied on speculation and conjecture in forming his opinions.[4]   *See generally Motion* [#90]; *see also Reply* [#100] at 1.   The Court addresses each argument in turn.

### A.   Mr. Gard's Qualifications

In determining whether expert testimony is admissible, the district court must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.   *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th

---

[4]    The Court notes that Plaintiff has included an argument regarding the use of boilerplate language within his broader argument regarding Mr. Gard's use of speculation and conjecture.   *See Motion* [#90] at 12.   Thus, the Court addresses this argument within the broader speculation argument as well.

Cir. 2009).   Mr. Gard is a retired law enforcement officer with nearly three decades of experience, all of which he spent with the City of Orting, Washington Police Department. *Curriculum Vitae of Gard* [#90-3] at 2.   He spent the last four years of his career with the Orting Police Department as Chief of Police.   *Id.*   Currently, Mr. Gard is a consultant for Force Science, LTD, where he works with attorneys and law enforcement officers to provide insight into use of force practices.   *Id.*   In this role, Mr. Gard provides support to attorneys, judges, jurors, investigators, review board members, and others by assessing generally accepted customs, principles, and standards in the field of law enforcement that impact use of force decision-making, training, and performance.   *Id.*   Mr. Gard is a certified Force Science Advanced Specialist, a designation he received after completing a sixteen-week, 300-hour course that is nationally certified by the International Association of Directors of Law Enforcement Standards and Training.   *Id.* at 5.   Mr. Gard holds a Bachelor of Science degree in Interdisciplinary Studies and a Master of Science degree in Criminal Justice and Forensic Psychology, both from Liberty University.   *Id.* at 4.   Mr. Gard is Defendants' proffered police practices expert and was asked to review and analyze police practices, policy, and threat assessments as they relate to Defendant Officers' duties and performance during their encounter with Plaintiff on June 2, 2020. *Gard Report* [#90-1] at 2.   Plaintiff argues that by testifying to his opinion regarding use of force during protests, the appropriate use of PepperBall projectiles, and the injuries which can occur when a victim is shot with a PepperBall projectile at close range, Mr. Gard is opining outside his knowledge, skills, experience, training, and education. *Motion* [#90] at 3-8.

### 1.    Qualifications to Opine on Use of Force

Plaintiff argues that, "[w]hile Gard may have general qualifications as a law enforcement professional, he is not qualified to opine on whether the officers' actions in *this case* fell below accepted standards in the field of law enforcement." *Id.* at 4. (emphasis in original).   Plaintiff points out that Mr. Gard's law enforcement career was spent in Orting, Washington, a town of less than 10,000 people and a police department consisting of only nine officers. *Id.* at 5.   Plaintiff argues that Mr. Gard's experience with protests as a law enforcement officer is wholly different from the circumstances underlying this case and, therefore, he is unqualified to offer opinion testimony about Defendant Officers' actions here. *Id.*

Mr. Gard policed only one protest during his almost thirty-year career with the Orting Police Department.   *Depo. of Gard* [#90-2] at 49:22.   He estimates that about five hundred people attended that protest and that it lasted two hours.   *Id.* at 50:12-13; 51:13-15.   According to Mr. Gard, six or seven officers were present for that protest and these officers were outfitted in patrol uniforms, were not wearing any riot gear, and were not carrying any less-lethal weapons.   *Id.* at 52:3-14.   At no time during his tenure with the Orting Police Department, including during this protest, did Mr. Gard exercise any crowd control protocols or encounter any situations which he would consider riots.   *Id.* at 53:25-54:5. Plaintiff argues that this experience is not comparable to the protest in Denver at the center of this case, which was attended by thousands of people.   *Motion* [#90] at 5.

Acceptance or rejection of an expert witness's qualifications is a matter within the discretion of the trial court.   *United States v. Dysart*, 705 F.2d 1247, 1251 (10th Cir.

1983).   The Tenth Circuit has held that "[t]he decision to exclude evidence is a drastic sanction."   *Brookman v. Dillon Cos., LLC*, No. 19-cv-03292-KLM, 2021 WL 3046915, at *4 (D. Colo. July 19, 2021).   While specialization is not required, courts will look to whether the proffered testimony is "within the reasonable confines" of the expert's subject area.   *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). "[A] lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight."   *Id.* at 971 (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)).   "The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most appropriate by the court."   *Lovato v. Burlington N. & Santa Fe Ry. Co.*, No. CIV.A. 00-RB-2584CBS, 2002 WL 1424599, at *3 (D. Colo. June 24, 2002).

In the present case, the Court finds that Mr. Gard's opinion regarding the Defendant Officers' use of force during the protest is within the reasonable confines of his expertise.   The fact that Mr. Gard's personal experience with policing protests is different from the circumstances underlying this case does not prevent him from forming an opinion about the Defendant Officers' use of force, specifically if their use of force was in accordance with generally accepted police practices.   The relevant standard is not whether the expert has identical experience to the underlying circumstances of the case, but whether his "technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue."   Fed. R. Evid. 702(a).   In the section of Mr. Gard's Report [#90-1] in which he discusses Defendant Officers' use of

force, Mr. Gard discusses the framework of threat assessment generally and then applies the framework to the facts of this case. *See Gard Report* [#90-1] at 16-19. Mr. Gard does not offer any expert opinion regarding the Defendant Officers' or the DPD's use of force in general during a large, at times violent protest, but instead offers his opinion on the Defendant Officers' use of force during their encounter with Plaintiff. Mr. Gard acknowledges that some facts known now were not known to the Defendant Officers at the time they encountered Plaintiff, and thus he explains generally accepted threat assessment practices. The Court finds this opinion testimony to be within the reasonable confines of the subject area of Mr. Gard's expertise. To the extent that Plaintiff argues that Mr. Gard's experience is too attenuated from the factual circumstances underlying this case, that is something "opposing counsel can no doubt highlight on cross-examination, and which bears on the weight or credibility of [Mr. Gard's] opinions, but not on their admissibility." *O'Sullivan*, 233 F. Supp. 3d at 924.

## 2. Qualifications to Opine on the Use of PepperBall Projectiles

Plaintiff next argues that Mr. Gard is unqualified to opine on the appropriate use of PepperBall projectiles. *Motion* [#90] at 5. In support of this argument, Plaintiff points to the fact that Mr. Gard has never had "personal or professional experience with PepperBall guns." *Id.* at 6. Specifically, Plaintiff emphasizes that Mr. Gard has never worked with or trained anyone on PepperBall launchers, has never written on the use of PepperBall launchers, has never been certified to use a PepperBall launcher, and is only professionally connected to PepperBall launchers through the fact that he purchased them for his department prior to retiring from the force. *Id.* Defendants counter by

-11-

arguing that Mr. Gard's training and experience with less-lethal munitions and his knowledge of the PepperBall launcher based on his review of articles and discussions with other law enforcement officers does qualify him to form opinions regarding Defendant Valentine's deployment of PepperBall projectiles in this case.   *Response* [#96] at 6.

Mr. Gard himself admits that he does not have "a whole lot of experience" with the PepperBall launcher.   *Depo. of Gard* [#90-2] at 55:3-4.   Throughout Mr. Gard's career with the Orting Police, the department never had PepperBall launchers.   *Id.* at 55:7-10. Mr. Gard was a certified less-lethal instructor during his time on the regional SWAT team between 1998 and 2006 and taught "40-millimeter launcher . . . OC spray . . . smoke flash bangs, [and] CS gas" but never PepperBall launchers or projectiles.   *Id.* at 57:9-11; 58:1-6; *see also Curriculum Vitae of Gard* [#90-3] at 5.   While the Court finds that Mr. Gard is likely unqualified to opine on the specific mechanics of a PepperBall launcher or projectile or how departments are best trained on use of the PepperBall system, as this is experience he does not have, the opinion offered by Mr. Gard is not within that scope.

In his Report [#90-1], Mr. Gard states: "The Officers' Response was Consistent with Generally Accepted Police Practices when they deployed Pepperball Projectiles against Hard Structural Surfaces to Incapacitate or Take Individuals into Custody Whose Conduct Rises to Defensive Resistance[.]" *Gard Report* [#90-1] at 20.   In forming this opinion, Mr. Gard relied on "DPD policies, case evidence, related testimony and [his] experience and training in police use of force" to determine that "the actions of the officers was [sic] reasonable to overcome defensive resistance and to effectuate lawful arrests for violations of Denver statutes and curfew orders."   *Id.* at 21.   The Court finds that Mr.

Gard needs neither specialized knowledge in the mechanics of the PepperBall launcher or projectile nor experience personally handling a PepperBall launcher to be able to opine on generally accepted police practices as they pertain to use of less-lethal force.   Indeed, Mr. Gard would not be permitted to render expert opinions on an entirely different field or discipline, but the Court finds that Mr. Gard's opinion regarding Defendant Officers' use of PepperBall projectiles is within the "reasonable confines" of his area of expertise.   *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) ("An expert must, however, stay within the reasonable confines of his subject area and cannot render expert opinions on an entirely different field or discipline.").

However, Mr. Gard's opinions in this area must be expressly couched in terms of what a reasonable law enforcement officer in Defendant Valentine's position would do based on his knowledge of generally accepted police practices, and Mr Gard will not be permitted to make conclusory statements as to whether Defendant Valentine acted reasonably here.[5]   The Court addresses below Plaintiff's argument that Mr. Gard invades the province of the jury with this testimony.   *See infra Section B*.   Any dispute as to Mr. Gard's qualifications in this area are fodder for Plaintiff's cross-examination at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary

---

[5]   Mr. Gard's opinion that "The Officers' Response was Consistent with Generally Accepted Police Practices when they deployed Pepperball Projectiles against Hard Structural Surfaces to Incapacitate or Take Individuals into Custody Whose Conduct Rises to Defensive Resistance" is permissible.   If Mr. Gard ventures to form conclusory opinions about the reasonableness of Defendant Officers' deployment of PepperBall projectiles in this case specifically, instead of within the framework of generally accepted police practices, that testimony will likely not be permitted.   *See Ortega v. City and County of Denver*, No. 11-cv-02394-WJM-CBS, 2013 WL 438579, at *3 (D. Colo. Feb. 5, 2013) (finding that expert testimony about whether the degree of force used was "reasonable" is not permitted while expert testimony about whether the degree of force used was in compliance with well-established police standards is permissible).

evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 3.      Qualifications to Opine on the Source of Plaintiff's Injury

Plaintiff next argues that Mr. Gard is unqualified to opine on the source of Plaintiff's eye injury.   *Motion* [#90] at 7.   Plaintiff avers that rendering an opinion such as this requires medical expertise which Mr. Gard does not have.   *Id.*   In response, Defendants argue that Mr. Gard does not intend to offer any medical opinions at trial and that in forming his opinion, Mr. Gard considered the evidence from the perspective of a police practices expert, rather than a medical expert.   *Response* [#96] at 8.

Mr. Gard has no medical training, education, or experience.   *See Curriculum Vitae of Gard* [#90-3]; *see also Depo. of Gard* [#90-2] at 63:7-9, 25.   Mr. Gard has "seen pictures" of injuries sustained from a PepperBall launcher and had conversations "with other instructors in [ ] the police field" about PepperBall injuries.   *Depo. of Gard* [#90-2] at 65: 1-10; 66:10-19.   Mr. Gard does have experience using and training on the use of other less-lethal munition, specifically 40-millimeter launchers and beanbag shotguns, which he states are "very similar and, in many cases, travel at the same velocity" as a PepperBall projectile.   *Id.* at 65:6-10.   Mr. Gard used the foregoing in forming his opinion regarding the source of Plaintiff's injury, as well as a single case study titled "Pepper-Ball-Related Ocular Injury" published by Clinical and Experimental Ocular Trauma and Infection ("CEOTI").   *Gard Report* [#90-1] at 22, 43-46.   The subject of this study is "[a] middle-aged man [who] sustained direct trauma to the right eye from a pepper-ball fired from approximately 1.8 meters away."   *Id.* at 44.

The Court acknowledges Defendants' assertion that Mr. Gard is not intending to offer any medical opinions, and instead is testifying as to his opinion of the injury based on his expertise in police practices, including the capabilities of less-lethal munitions. However, the Court finds that Mr. Gard's opinion regarding Plaintiff's eye injury, specifically the statement that Plaintiff's eye injury is "inconsistent with an injury sustained from a PepperBall launcher" is venturing too far into the territory of a diagnostic medical opinion.   The Tenth Circuit has held that even possessing a medical degree is not sufficient in all cases to permit a physician to testify concerning any medical-related issue. *Ralston*, 275 F.3d at 970.   Indeed, Mr. Gard is not a physician and has no medical experience, training, or expertise, so is not qualified under Rule 702 to provide medical opinions.   As previously stated, an expert's testimony must stay within the reasonable confines of his or her subject area, and the Court finds that opining as to whether Plaintiff's eye injury is consistent with an injury sustained from a PepperBall Launcher is outside of the reasonable confines of Mr. Gard's expertise.   *See id.*

The Court notes that other statements contained in the section of Mr. Gard's report pertaining to Plaintiff's injury are permissible.   For example, the Court does not take issue with Mr. Gard testifying as to how he would expect an injury sustained from a PepperBall shot to present, based only on his experience as a police officer and use of force expert. This statement more readily falls within the reasonable confines of Mr. Gard's expertise as it is couched in terms of what Mr. Gard, as a law enforcement officer, would expect an injury suffered from less-lethal munition to look like, but does not venture to offer an opinion teetering on the edge of a medical diagnosis.   In sum, Mr. Gard may offer opinion

-15-

testimony as to how he would expect an injury from a PepperBall launcher to appear, but his testimony will be barred to the extent that he offers any statements regarding whether Plaintiff's injury is consistent or inconsistent with this expectation, as Mr. Gard is unqualified to offer any expert opinion that could be seen as a medical diagnosis.   *See Valdez v. Motkya*, No. 15-cv-0109-WJM-STV, 2021 WL 11458485, at *2 (D. Colo. Mar. 25, 2021) (finding that a police practices expert is not qualified to testify regarding forensic pathology as he has no medical experience); *see also Murphy v. Sandoval County*, No. 17-CV-0585 SWS/MLC, 2019 WL 8331482, at *6 (D.N.M. Feb. 5, 2019) (finding that retained corrections expert "can testify as to correction operations, administration, training, policies and supervision" but does not have the requisite qualifications to "opine as to medical conditions [or] medical diagnosis").   Plaintiff is undoubtedly free to challenge the basis of Mr. Gard's opinion as to how an injury sustained from a PepperBall launcher would present with vigorous cross-examination at trial.   *Daubert*, 509 U.S. at 596.

Accordingly, the Court finds that Mr. Gard is sufficiently qualified to opine on the appropriateness of Defendant Officers' use of force and the appropriate use of PepperBall launchers and projectiles, so long as those opinions are expressly couched in terms of generally accepted police practices and not whether Defendant Officers were reasonable here.   Therefore, the Motion [#90] is **denied** to the extent that Plaintiff seeks to exclude Mr. Gard's testimony regarding the appropriateness of Defendant Officers' use of force and Defendant Valentine's use of the PepperBall launcher.   The Court finds that Mr. Gard is not qualified to opine on the source of Plaintiff's injury but may testify as to how

he would expect an injury sustained from a PepperBall launcher to appear, generally. Thus, the Motion [#90] is **granted** to the extent that Plaintiff seeks to exclude Mr. Gard's opinion stating that Plaintiff's eye injury is inconsistent with an injury sustained from a PepperBall launcher.

## B.    The Jury's Fact-Finding Function

Plaintiff next argues that Mr. Gard's opinion testimony, specifically his opinion that Defendant Officers' conduct was reasonable under the circumstances, usurps the jury's fact-finding function.   *Motion* [#90] at 9.   Plaintiff also argues that Mr. Gard's opinion regarding the source of Plaintiff's injury usurps the role of the jury; however, based on the Court's aforementioned finding that Mr. Gard is prohibited from offering such testimony, the Court addresses only the argument regarding the reasonableness of Defendant Officers' conduct.   *See id.*   Defendants counter by arguing that Mr. Gard in fact does not opine that Defendant Officers' conduct was reasonable under the circumstances, and instead offers his opinion that their actions were consistent with generally accepted police practices.   *Response* [#96] at 10.

Under Rule 702(a), expert testimony in the form of an opinion is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue[.]"   Fed. R. Evid. 702(a).   *See also Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue.") (internal quotations omitted).   In the Tenth Circuit, the touchstone of admissibility of expert testimony is its helpfulness to the trier of fact.   *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002).   Expert testimony is excluded when the opinions

-17-

or conclusions proffered are obvious, meaning that, when presented with the same evidence, a lay juror could come to the same conclusion or opinion without the help of an expert.   *See United States v. Gabaldon*, 389 F.3d 1090, 1099 (10th Cir. 2004) (finding that expert conclusion is utterly obvious and is not something for which expert testimony is needed).   An expert witness's testimony must be helpful to the jury but may not intrude on the jury's role as the finder of fact, a distinction that is not always clear.   *O'Sullivan*, 233 F. Supp. 3d at 921-22.

Plaintiff argues that the reasonableness of the Defendant Officers' actions is for the jury to decide.   *Motion* [#90] at 9.   In the present case, Plaintiff alleges that his Fourth Amendment rights to be free from unreasonable and excessive force were violated when Defendant Officers used less-lethal weapons on him "while he presented no threat and without an individualized determination of individual conduct justifying such force[.]"   *Am. Compl.* [#27] ¶ 158.   Thus, the reasonableness of the Defendant Officers' conduct is an ultimate issue to be decided by the jury.   It is well settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue."   *O'Sullivan*, 233 F. Supp. 3d at 922 (quoting Fed. R. Evid. 704(a)).   Defendants argue in their Response [#96] that Mr. Gard did not go so far as to say that the Defendant Officers' actions were "reasonable under the circumstances," but instead stated only that "the officers' response was consistent with generally accepted police practices[.]"   *Response* [#96] at 10.   The Court disagrees.   At several points in Mr. Gard's report, he states that the Defendant Officers' use of force was reasonable.   *See Gard Report* [#90-1] at 18, 19, 20, 21 ("The Officers Use of Force was Reasonable"; ". . . it was reasonable and appropriate for Officer

Valentine to saturate the area where Mr. Cruz was stopped . . ."; "The Officers' Response was Reasonable"). The Court has expressly held that proposed testimony about whether the degree of force used during a police encounter with a civilian was "reasonable" is not permitted. *See Ortega*, 2013 WL 438579, at *3 ("[T]he Court sees a distinction between [an expert] testifying about whether the degree of force used was 'reasonable' (which the Court will not permit) and whether the degree of force used was in compliance with well-established modern police standards (which is permissible).") Accordingly, Mr. Gard is not permitted to testify as to the reasonableness of the Defendant Officers' actions as this invades the province of the jury.

However, the Court finds that Mr. Gard's opinion testimony that the Defendant Officers' conduct was consistent with generally accepted police practices does not usurp the jury's role as the finder of fact. A lay juror does not have personal knowledge of generally accepted police practices or what would be considered appropriate conduct when police officers are faced with different situations. In his report, Mr. Gard explains the process by which police officers conduct use-of-force threat assessments and how that framework applies to this case. *See id.* at 16-20. In doing so, Mr. Gard is assisting the jury in their understanding of why the Defendant Officers responded in the manner that they did.

In sum, Mr. Gard may opine as to whether the Defendant Officers acted in accordance with generally accepted police practices during their encounter with Plaintiff. Mr. Gard may not, however, testify as to the reasonableness of the Defendant Officers' conduct in this case. He may certainly provide the jury with the necessary framework

they will need to come to this determination, such as explaining generally accepted police practices that are invoked in a situation like in the present case.   However, whether the Defendant Officers were reasonable in their response and use of force during this encounter with Plaintiff must be decided by the fact finder.   Accordingly, Plaintiff's Motion [#90] is **granted** to the extent that Plaintiff seeks to exclude testimony from Mr. Gard regarding whether Defendant Officers' conduct here was reasonable.

## C.      Speculation and Conjecture

Finally, Plaintiff argues that Mr. Gard relied on speculation and conjecture in forming his opinions.   *Motion* [#90] at 9-12.   Specifically, Plaintiff argues that Mr. Gard's opinion regarding any potential threat that Plaintiff posed to Defendant Officers is based on speculation and not supported by the facts of this case.   *Id.* at 10-11.   Within this argument, Plaintiff avers that Mr. Gard cannot offer boilerplate language in his report that has no relevance or bearing on this case.   *Id.* at 12.   Defendants counter by arguing that Mr. Gard did not speculate that Plaintiff posed a threat and instead explained only that the Defendant Officers did not know whether Plaintiff posed any threat to them and thus acted in accordance with what they knew or did not know at the time.   *Response* [#96] at 11-13.   Defendants further argue that Mr. Gard's opinions are factually supported and that any opposition to alleged boilerplate language is premature and more appropriately addressed at trial.   *Id.* at 13-14.

"[T]o satisfy the strictures of *Daubert*, an expert may not base his or her testimony upon assumptions that are not supported by the evidence[.]"   *Gianfrancisco v. Excelsior Youth Ctrs., Inc.*, No. 10-cv-00991-PAB-KMT, 2012 WL 2890916, at *4 (D. Colo. July 16,

2012) (quoting *Fanning v. Sitton Motor Lines, Inc.*, No. 08-cv-2464 CM/DJW, 2010 WL 4261476, at *7 (D. Kan. March 10, 2010)).   While expert testimony must be grounded in facts, enabling a reasonable conclusion as opposed to mere speculation or conjecture, absolute certainty is not required.   *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).   In use of force cases, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.   *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In evaluating Defendant Officers' threat assessment and response, Mr. Gard acknowledges that it is now known that Plaintiff was not carrying any concealed weapons when he was detained; however this was not known to the Defendant Officers at the time they encountered Plaintiff in the parking garage.   *Gard Report* [#90-1] at 18.   Mr. Gard discusses what officers did know at the time of the encounter with Plaintiff, i.e., that protestors were violating curfew and were throwing rocks, bottles, and other debris at officers, and that an individual engaged in the protests had a handgun.   *Id.*; *see also Depo. of Gard* [#90-2] at 85:18-25.   Mr. Gard opines that, based on what *was* known to Defendant Officers at the time and because Plaintiff was carrying a backpack, was running from the police, and was without any visible media credentials, it was reasonable for Defendant Officers to believe that Plaintiff posed a threat to their safety.   *Gard Report* [#90-1] at 19; *Depo. of Gard* [#90-2] at 86:1-8.   However, Mr. Gard does not limit his opinion to what a reasonable officer would do in a factually similar situation.   Mr. Gard goes so far as to say that, "[b]ecause [Plaintiff] posed an immediate and ongoing threat after he fled from the officers and because he was an uncredentialed, self-proclaimed

-21-

member of the 'press' who had access to a backpack and unchecked clothing, it was reasonable and appropriate for Officer Valentine to saturate the area where [Plaintiff] was stopped walking until he was safely taken into custody." *Gard Report* [#90-1] at 20. The Court finds that this statement, definitively identifying Plaintiff as an "immediate and ongoing threat" and judging the actions of Defendant Valentine in this case as "reasonable and appropriate," is beyond what is permissible.

In his deposition, Mr. Gard concedes that nowhere in Defendant Officers' testimony do they state that they were under the impression that Plaintiff had a gun or other weapons in his backpack. *Depo. of Gard* [#90-2] at 86:9-13. Further, Defendant Officers did not state that they ever suspected that Plaintiff may have had something potentially dangerous in his backpack. *Id.* at 86:14-18. As to the protestor with a handgun, Mr. Gard stated in his deposition that a description of this individual was given and that this person was arrested half an hour before Defendant Officers ever encountered Plaintiff. *Id.* at 87:13-23. The Court finds that these admissions chip away at the factual grounds Mr. Gard has for making such conclusory statements, including that Plaintiff was an immediate and ongoing threat. As previously stated, Mr. Gard may opine as to whether the Defendant Officers acted in accordance with generally accepted police practices but is barred from making conclusory statements that invade the province of the jury and are unsupported by the underlying factual circumstances of this case. Mr. Gard may explain, in general terms, how an individual's attire, what they are carrying, and their actions, such as fleeing from police officers, contribute to a threat assessment insofar as generally accepted police practices are concerned. In another recent case

stemming from protests in Denver, Colorado following the death of George Floyd, the Court held that "so long as [expert] opinions are expressly couched in terms of the standard of care of police officers, i.e., what a reasonable officer would do in the same or similar circumstances, they would not be objectionable . . . ."   *Order* [#300 in No. 20-cv-01878-RBJ] at 5.   The Court finds that Mr. Gard's opinions regarding whether Plaintiff posed a threat to Defendant Officers are not expressly couched in such terms and therefore are impermissibly speculative.

Lastly, Plaintiff argues that Mr. Gard may not offer boilerplate language in his report that has no relevance or bearing on this case.   *Motion* [#90] at 12.   Plaintiff points to several instances in Mr. Gard's deposition where he states that certain experience or expertise does not apply to this case.   *See id.*   Specifically:

> He admitted that his "human factor analysis" expertise noted in the report does not apply to this case.
>
> He admitted that his experience as a firearms instructor has no bearing on this case.
>
> He admitted that his experience with action/reaction effects does not apply to this case.
>
> He admits that his training on cognitive interviews and inconsistencies between witness accounts and objective evidence have nothing to do with this case.

*Id.* (internal citations omitted).   In response, Defendants argue that the excerpts Plaintiff points to go either to Mr. Gard's qualifications as an expert or are part of the "threat assessment framework underlying Mr. Gard's review and opinions."   *Response* [#96] at 13-14.   Defendants also aver that Plaintiff's argument regarding these statements is premature and is more appropriately raised and decided at trial based on the evidence

presented.   *Id.* at 14.   The Court notes that Plaintiff's Reply [#100] offers no further argument and does not address Defendants' counterargument to this issue.

"Boilerplate" language is "ready-made or all-purpose language that will fit in a variety of documents."   *Boilerplate*, Black's Law Dictionary (11th ed. 2019).   Boilerplate refers to "trite, hackneyed writing."   *Banks v. Jackson*, No. 20-cv-02074-KMT, 2021 WL 3857614, at *3 (D. Colo. Aug. 27, 2021).   The Court finds that the statements within Mr. Gard's Deposition [#90-2] that Plaintiff objects to as boilerplate do not fall within this definition.   To the contrary, terms such as "human factor analysis", "action/reaction effects", and "cognitive interviews" are far from all-purpose language.   These are terms requiring definition and context, something that an expert in this field should be able to provide.   To the extent that Plaintiff argues that these statements are irrelevant or have no bearing on this case, that is properly addressed at trial, if Defendants elicit testimony pertaining to these statements.

Accordingly, the Motion [#90] is **granted** to the extent that Plaintiff seeks to exclude testimony from Mr. Gard regarding whether Plaintiff posed a threat to Defendant Officers, as such conclusory statements are impermissible speculation.   The Motion [#90] is **denied** to the extent that Plaintiff seeks to exclude specified statements on the grounds that they contain boilerplate language.

## IV.   Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#90] is **GRANTED in part** and **DENIED in part**, as follows.   The Motion [#90] is **granted** to the extent that Plaintiff seeks to limit

Mr. Gard's opinion testimony as to the source of Plaintiff's injury and to the extent that Plaintiff seeks to limit Mr. Gard's testimony regarding the reasonableness of Defendant Officers' actions during their encounter with Plaintiff, including the reasonableness of their belief that Plaintiff posed an immediate threat.   The Motion [#90] is otherwise **denied**.


Dated: July 7, 2023

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge