IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03388-KAS

AMBROSE CRUZ,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
HEATHER R. JOSSI, #07059, and
KEITH VALENTINE,

     Defendants.

_____

## ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

     This matter is before the Court on Defendants' **Motion for Summary Judgment** [#59] (the "Motion").[1] Plaintiff filed a Response [#70] in opposition to the Motion [#59], and Defendants filed a Reply [#74]. The Court has reviewed the briefs, the entire case file, and the applicable law. For the reasons set forth below, the Motion [#59] is **GRANTED in part and DENIED in part**.[2]

---

[1] Shortly after the Motion [#59] was filed, Defendants also filed a Notice of Errata Regarding Exhibits Filed with Defendants' Motion for Summary Judgment [#60]. The only differences between the original and the amended Exhibits C and E are to the specific designations within those depositions. *See* [#60] ¶¶ 1-2. Defendants further note that their filing at Docket No. 59-6 "is not part of the Motion for Summary Judgment and should be disregarded," and that Exhibits G and I were accidentally omitted from the original filing. *See id.* ¶¶ 3-4.

[2] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#12, #14, #107]; *Reassignment* [#111].

## I. Summary of the Case

The following facts are undisputed unless otherwise indicated. Following George Floyd's death on May 25, 2020, many protests took place across the country, including in Denver starting on May 28, 2020. *Am. Compl.* [#27] ¶¶ 1, 7. On May 30, 2020, following a State of Local Disaster Emergency decree, Michael Hancock, then Mayor of Denver, enacted an Emergency Curfew (the "Curfew"). *Defs.' Ex. A, May 30, 2020 Emergency Curfew Issued Pursuant to DRMC Section 2-98* [#59-1]. The Curfew announcement noted that civil disturbances had occurred in Denver resulting in significant damage to people and property, with the majority of the destruction and violence occurring at night. *Id.* at 1. The Mayor therefore imposed the nighttime Curfew in all public places within Denver, including streets and public right-of-ways from 8:00 p.m. until 5:00 a.m. starting on May 30, 2020, through June 1, 2020. *Id.* at 2. During the Curfew, all persons were prohibited from using, standing, sitting, travelling, or being present on any public street or in any public place, including for the purpose of travel, with the exceptions of: (a) all law enforcement, fire, paramedics or other medical personnel, the Colorado National Guard, other emergency response personnel authorized by Denver, and credentialed members of the news media; (b) individuals traveling directly to and from work, traveling directly to and from the airport, seeking exempt care, fleeing dangerous circumstances, or experiencing homelessness; and (c) any person to whom permission was specifically granted by a Denver official. *Id.*

On June 1, 2020, the Mayor extended the Curfew through June 5, 2020, from 9:00 p.m. through 5:00 a.m. each night. *Defs.' Ex. B, June 1, 2020 Emergency Curfew Issued Pursuant to DRMC Section 2-98* [#59-2]. Later that same day, Plaintiff's ex-wife dropped

him off near Lincoln Park after the Curfew went into effect for the evening. *Defs.' Ex. 3, Depo. of Pl.* [#59-3] at 55:9-12, 61:8-13, 61:18-25, 63:3-6. Plaintiff does not recall if he was aware of the City's emergency curfew order at the time. *Id.* at 57:19-22. He states that he attended the protests in order to take photographs. *Id.* at 54:14-22. However, he was not a credentialed member of the press on June 1, 2020; in fact, he has never been a member of any media organizations and has never possessed press credentials. *Id.* at 14:22-25, 15:11-18. Instead, Plaintiff essentially asserts that he attended the protest as a freelance photographer. *Id.* at 54:14-22, 63:20-64:1.

When he arrived, Plaintiff observed over 100 protestors in the Lincoln Park area, where he remained for approximately one hour interacting with protestors and taking several photographs with his camera. *Id.* at 63:13-25, 64:1. At some point, numerous police officers approached the park, where Incident Commander Patrick Phelan ordered teams of Denver and mutual-aid officers to flank the peaceful protestors at the Capitol and push them south using gas and less-lethal weapons. *Pl.'s Ex. 2, Radio Dispatch* [#64-2, #67] at 23:31:58-23:33:05, 23:57:07-00:03:17; *Pl.'s Ex. 3, CAD Report* [#64-3]. Shortly after midnight, the large group of officers approached the protestors from multiple directions, primarily using a large amount of gas to force them to move out of the area. *Defs.' Ex. 3, Depo. of Pl.* [#59-3] at 68:1-11, 69:16-70:1, 70:7-15, 71:5-10, 72:24-73:1; *Pl.'s Ex. 1, Colo. State Patrol Video* [#64-1, #67] at 12:02-12:10 a.m.; *Pl.'s Ex. 4, HALO Video* [#64-4, #67] at 12:02:00-12:10:00 a.m.; *Pl.'s Ex. 5, CSP Video v211* [#64-5, #67] at 12:02:00-12:04:20 a.m.; *Pl.'s Ex. 6, Civil Action No. 20-cv-01878-RBJ Trial Testimony of Claire Sannier* [#64-6] at 149:12-150:10; *Pl.'s Ex. 7, Depo. of Eagleburger* [#64-7] at 57:14-58:3, 106:18-108:14.

After he was forced from Lincoln Park, Plaintiff ended up at a nearby sandwich shop named Quiznos located on the southwest corner of 13th Street and Grant Street, where he encountered a group of approximately 30 protestors, one of whom had an asthma attack from the gas; this was the last location where Plaintiff took any photographs. *Depo. of Pl.* [#59-3] at 76:2-16, 80:4-17, 107:18-22; *Pl.'s Ex. 8, Photograph in Quiznos Parking Lot* [#64-8]. When police officers arrived there shortly thereafter, Plaintiff and other protestors explained that they were injured and so were told by officers they could pass, but then officers opened fire on the group with PepperBalls. *Defs.' Ex. 3, Depo. of Pl.* [#59-3] at 78:21-81:23; *Pl.'s Ex. 7, Depo. of Eagleburger* [#64-7] at 113:17-114:12. The group, including Plaintiff, dispersed in response; Plaintiff was not struck by a PepperBall at this location. *Defs.' Ex. 3, Depo. of Pl.* [#59-3] at 80:4-17. After leaving the Quiznos parking lot, Plaintiff observed that several streets in the area were blocked off; however, a multi-level parking garage on Lincoln Street between 12th and 13th Streets was not barricaded and he therefore entered it. *Id.* at 81:24-25, 82:1-25, 83:1; *Pl.'s Ex. 11, Photograph of Garage* [#64-11]; *Pl.'s Ex. 12, Google Images of Garage* [#64-12].

During the timeframe relevant to Plaintiff's claims, Defendant Keith Valentine ("Valentine") and Defendant Heather Jossi ("Jossi") were members of the Denver Police Department ("DPD") Gang Unit. *Defs.' Ex. D, Depo. of Valentine* [#59-4] at 28:23-25, 29:1, 32:11-13; *Defs.' Ex. E, Depo. of Jossi* [#60-2] at 26:14-22. The night of June 1, 2020, Defendants Valentine and Jossi were on Lincoln Street riding in a rapid deployment vehicle ("RDV"); Defendant Valentine was armed with a PepperBall gun, and Defendant Jossi was not. *Depo. of Valentine* [#59-4] at 65:18-22, 66:12-14, 66:19-25, 67:1-12, 69:20-22, 70:1-13, 73:16-25, 74:1-5; *Depo. of Jossi* [#60-2] at 71:22-25, 72:1-6, 80:22-

25, 81:1-4. Following a report of a group of people on Lincoln Street after the Curfew took effect, several officers exited the RDV to follow the protestors, some of whom ran into the previously-mentioned parking garage. *Pl.'s Ex. 10, AirOne Video* [#64-10, #67] at 00:35:30-00:35:51 (time on video footage); *Defs.' Ex. 3, Depo. of Pl.* [#59-3] at 102:7-25. Many of the individuals who ran into the parking garage ran towards the staircase and then up the stairs. *Depo. of Valentine* [#59-4] at 67:19-25, 68:1-2, 76:12-18, 78:19-25, 79:1-2. From the sidewalk in front of the parking garage, Defendant Valentine discharged PepperBalls at the back wall of the garage staircase to saturate the area and then proceeded to follow the individuals into the garage and up the stairs. *Id.* at 67:19-25, 68:1-2, 81:18-25, 82:1, 82:6-14, 86:5-25, 87:1-11.

The precise details of Plaintiff's movements inside the garage are a little unclear, and ultimately immaterial to resolution of the Motion [#59]. The evidence suggests that, while descending the garage stairs, Plaintiff saw officers, turned around and ascended the stairs, saw a police vehicle in the alley behind the garage, and then descended the stairs again, apparently to one of the bottom levels of the garage.[3] *Defs.' Ex. 3, Depo. of Pl.* [#59-3] at 84:3-87:17; *Pl.'s Ex. 10, AirOne Video* [#64-10, #67] at 00:34:31-00:35:53 (time on video footage). While there, Defendant Valentine "passed [Plaintiff] up chasing other people." *Defs.' Ex. 3, Depo. of Pl.* at 87:22-23. Plaintiff entered the stairs again, but

---

[3] Although not explicitly stated by the parties, the alley on the back side of the parking garage appears to be on a level or two higher than the street on the front/opposite side of the garage. *See, e.g.*, *Pl.'s Ex. 10, AirOne Video* [#64-10, #67] at 00:34:31-00:35:53.

as he walked up, he looked up and was "shot in the face," i.e., struck in the face with a PepperBall, purportedly by Defendant Valentine.[4] *Id.* at 88:14-89:1, 92:2-22.

Despite there being a partial video recording from a parking garage security camera, the facts regarding what precisely happened next between Plaintiff and Defendants Valentine and Jossi are mostly in dispute and are discussed in depth in the Analysis section below. In short, the incident occurred on the ground floor of the parking garage and purportedly involved Defendant Jossi pointing a gun at Plaintiff, Defendant Valentine shooting PepperBall projectiles at Plaintiff, and Plaintiff going to his knees with his hands above his head before lying flat on the ground. *See generally Pl.'s Ex. 18, Garage Video* [#64-18, #67].[5] Ultimately, Plaintiff was arrested and charged with a curfew violation and failure to abide by a lawful order. *Defs.' Ex. G, Pl.'s Arrest Report* [#60-3] at 1. During the arrest, Defendant Jossi placed Plaintiff in handcuffs. *Depo. of Jossi* [#60-2] at 115:10-20; *Pl.'s Ex. 18, Garage Video* [#64-18, #67] at 50:27. Once in handcuffs, Plaintiff was directed to the street in front of the parking garage with other arrestees. *Depo. of Valentine* [#59-4] at 108:14-25; *Depo. of Jossi* [#60-2] at 122:13-18. Defendants Valentine and Jossi, as well as other DPD officers, observed an injury to Plaintiff's eye. *Depo. of Valentine* [#59-4] at 111:4-14; *Depo. of Jossi* [#60-2] at 102:15-18; *Defs.' Ex. H, Depo. of Damon Bowser* [#59-7] at 58:9-24. DPD officers called an ambulance to tend to

---

[4] Defendants do not explicitly admit that Plaintiff was struck in the face by a PepperBall; rather, they merely "admit Plaintiff claims he was struck in the face with [a] [P]epper[B]all." *Reply* [#74] at 2.

[5] The Court notes that Defendants' Exhibit F is the parking garage's video recording of some of the events underlying this lawsuit. *See, e.g.*, *Motion* [#59] at 7. The Court has no record of Defendants submitting this exhibit for the Court's consideration. However, Defendants' Exhibit F is obviously the same video as Plaintiff's Exhibit 18 [#64-18], the video of which was provided to the Court as Conventionally Submitted Material [#67].

Plaintiff's eye injury. *Depo. of Pl.* [#59-1] at 122:4-9; *Depo. of Valentine* [#59-4] at 110:6-12, 124:20-25; *Depo. of Jossi* [#60-2] at 122:13-24.

As a result of the foregoing events, Plaintiff asserts the following claims under 42 U.S.C. § 1983: (1) violation of the First Amendment, *Am. Compl.* [#27] ¶¶ 145-56; (2) violation of the Fourth Amendment, *id.* ¶¶ 157-62; and (3) failure to intervene, *id.* ¶¶ 163-68. Plaintiff seeks a "permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above," "declaratory judgment that Defendants' conduct detailed herein was a violation of the right of the Plaintiff under the United States Constitution," and compensatory and punitive damages. *Id.* ¶¶ 169-75. In the present Motion [#59], Defendants seek entry of summary judgment in their favor on all claims.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

In determining whether summary judgment is appropriate, the Court resolves factual disputes and draws reasonable inferences in favor of the nonmovant. *Chase Mfg., Inc. v. Johns Manville Corp.*, 79 F.4th 1185, 1195 (10th Cir. 2023). However, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted) (emphasis in original); *see also N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171-72 (10th Cir. 2021) ("To survive a motion for summary judgment, the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party].'") (alterations and omission in original) (citation omitted). To determine whether a genuine issue of material fact exists, the Court considers "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In other words, an issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party, and a fact is material if it might affect the outcome of the case under the governing substantive law. *Id.* at 248.

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *Anderson*, 477 U.S. at 248, 256. When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an

essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
> . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

### III. Analysis

#### A.    Qualified Immunity

Defendants Jossi and Valentine are sued in their individual capacities only. *Am. Compl.* [#27] ¶¶ 23-24. Both assert that they are protected from liability by qualified immunity. *Motion* [#59] at 14-19. A qualified immunity defense "protects government officials from civil liability so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022) (quoting *Pearson v. Callahan*, 555

U.S. 223, 231 (2009)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). To determine whether qualified immunity applies, the Court considers (1) whether "the officers' alleged conduct violated a constitutional right," and, if so, (2) whether "it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023) (citation and internal quotation marks omitted).

## 1.    Claim One: First Amendment

To survive summary judgment on Plaintiff's claims that Defendant Valentine and Defendant Jossi retaliated against him for exercising his First Amendment rights, Plaintiff must provide evidence that (1) he engaged in constitutionally protected activity, (2) Defendants' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) Defendants' actions were substantially motivated as a response to Plaintiff's protected conduct. *See Sgaggio v. Suthers*, No. 22-1138, 2023 WL 3055572, at *5 (10th Cir. Apr. 24, 2023) (citing *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)). Defendants Valentine and Jossi argue that Plaintiff cannot meet the first and third elements. *See Motion* [#59] at 9, 11.

In addition, Defendants argue that "Plaintiff's lack of press credentials means he was violating the law on June 1, 2020, making his activities not protected because there was probable cause to arrest him." *Reply* [#74] at 7 (citing *Nieves v. Bartlett*, 587 U.S. __, __, 139 S. Ct. 1715, 1728 (2019)). However, Defendants mischaracterize Plaintiff's argument. Plaintiff has not argued that his *arrest* was retaliatory, but rather only that the

force used by Defendants Valentine and Jossi to effectuate that arrest was retaliatory. *See, e.g.*, *Am. Compl.* [#27] ¶¶ 145-56 (mentioning only the use of force, not Plaintiff's arrest, in the recitation of Plaintiff's First Amendment claim); *Scheduling Order* [#38] § 3.a. (Plaintiff's statement of claims discussing only use of force in connection with his First Amendment claim, not his arrest); *Response* [#70] at 20 (discussing Plaintiff's First Amendment injuries in terms of the force used against him, not in terms of his arrest). As such, probable cause does not enter the Court's First Amendment analysis under the circumstances of this case. *See, e.g.*, *Bustillos v. City of Carlsbad, New Mexico*, No. 21-2129, 2022 WL 1447709, at *5 (10th Cir. May 9, 2022) ("In addition to the three [First Amendment retaliation] elements, a First Amendment retaliation claim based on a false arrest requires a separate '"threshold showing"—generally, a plaintiff must show a false arrest.' In other words, [the plaintiff] must show a lack of probable cause.").[6]

### a.   Constitutionally Protected Activity

Plaintiff asserts that he engaged in two forms of constitutionally protected activity: (1) attending the protest to support and assist the protestors, and (2) taking photographs as a freelance photojournalist. *Response* [#70] at 18.

### i.   Attending to Support and Assist the Protestors

In support of the first type of activity, Plaintiff cites *Boos v. Barry*, 485 U.S. 312, 318 (1988), *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155 (D. Or. 2020), but none of these cases support the proposition that Plaintiff has a constitutionally protected right to support and assist protestors where he himself was not exercising his First Amendment right to

---

[6] Plaintiff's arrest claims are part of a class-action lawsuit in *Epps v. City and County of Denver*, No. 20-cv-01878-RBJ. *Response* [#70] at 4, 4 n.4.

engage in protest. Plaintiff cites *Boos* for the unexceptional proposition that "protest is 'classically political speech'." *Response* [#70] at 18 (citing *Boos*, 485 U.S. at 318). In *Hartman*, the United States Supreme Court merely stated that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." 547 U.S. at 256. In *Don't Shoot Portland*, the United States District Court for the District of Oregon stated that "[t]he First Amendment provides that all citizens have a right to hold and express their personal political beliefs," including by "[o]rganized political protest" such as "demonstrations, protest marches, and picketing." 465 F. Supp. 3d at 1155.

In short, Plaintiff has not provided legal authority, and the Court has found none, that, based on the facts presented, he had a "First Amendment right to be present in a public place in solidarity with others protesting police brutality." *Response* [#70] at 18. Importantly, the facts cited by Plaintiff do not demonstrate that he was expressing his own views,[7] or even that the viewpoints of the protestors impacted his decision to attend the protest on June 1, 2020. *See, e.g.*, *Depo. of Cruz* [#59-3] at 51:1-52:18, 54:14-55:8, 63:13-64:1. In fact, Plaintiff concedes that "there is no evidence that Plaintiff had any purpose other than to peacefully *support* the protestors and document the protest as a photojournalist." *Response* [#70] at 19 (emphasis added). Accordingly, the Court finds that, under the specific circumstances here supported by evidence, Plaintiff has not

---

[7] The Court notes that the parties have not raised the issue of whether this first element could be met if the police officers *believed* that Plaintiff was exercising his constitutional right of expression as a protestor, even if he were not actually protesting.

demonstrated that attending the protest to support and assist the protestors constitutes constitutionally protected activity for purposes of the First Amendment.[8]

### ii.    Attending to Take Photographs

In support of the second form of alleged protected constitutional activity, i.e., taking photographs as a freelance photojournalist, Plaintiff cites *Press-Enterprise Company v. Superior Court of California for the County of Riverside*, 478 U.S. 1-2 (1986); *Irizarry v. Yehia*, 38 F.4th 1282, 1288-92 (10th Cir. 2022); *Glik v. Cunniffe*, 655 F.3d 78, 83-84 (1st Cir. 2011); and *Bustillos v. City of Artesia*, 591 F. Supp. 3d 1051, 1064 (D.N.M. Mar. 17, 2022) ("News-gathering protections of the First Amendment do not turn on professional credentials or status."). *Response* [#70] at 18. In *Press-Enterprise Company* (from which Plaintiff cites the Syllabus rather than the opinion itself), the United States Supreme Court held that the First Amendment right of access to criminal proceedings applies to preliminary hearings, which is inapposite to the issues in the present case. *Id.* (citing 478 U.S. at 1-2). However, the other three cases cited by Plaintiff do support the proposition that his right as a freelance journalist to document the protests was protected. First, in *Irizarry*, the Tenth Circuit Court of Appeals held that there is "a First Amendment right to film the police performing their duties in public." 38 F.4th at 1288. Second, in *Glik*, the First Circuit Court of Appeals also held that "the First Amendment protects the filming of government officials in public spaces." 655 F.3d at 83. Third, in *Bustillos*, the United States District Court for the District of New Mexico relied on *Glik* to state:

> "The First Amendment right to gather news is . . . not one that inures solely to the benefit of the news media; rather, the public's right of access to information is coextensive with that of the press." *Glik v. Cunniffe*, 655 F.3d

---

[8] While declining to comment on the viability of such a claim, the Court notes that Plaintiff has not asserted a theory of a First Amendment violation based on freedom of association. *See generally First Am. Compl.* [#27]; *Scheduling Order* [#38]; *Response* [#70].

78, 83 (2011). News-gathering protections of the First Amendment do not turn on professional credentials or status. *Id.* at 84 (explaining that "changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw," because the "proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper").

591 F. Supp. 3d at 1064.

Here, Plaintiff has provided evidence that his activities taking photographs of the protest and related police activity as a freelance journalist fall within the ambit of the First Amendment's protections. *See Depo. of Pl.* [#60-1] at 8:12-15:10 (discussing his background, including that he was self-employed as a photographer for ten years, that his journalism photography had been published in various publications, that he received photo credit for those publications, that he worked in both still photography and video journalism, and that his work documenting protests had been published in the past), 51:1-52:24 (stating that he has documented protests concerning issues involving the police "quite a few" times), 54:14-55:8 (stating that on June 1, 2020, he "chose to go out and bring my skills out" regarding documentation of the protest), 63:13-64:1 (stating that his purposes at the protest "was to document the protest activity").

Accordingly, the Court finds that Plaintiff has provided evidence sufficient to meet the first element of Plaintiff's First Amendment claim.

### b.    Substantially Motivated

Regarding the third element of his First Amendment claim, Plaintiff presents evidence that Defendant Valentine and Defendant Jossi *may* have both been aware that

Plaintiff was a photojournalist. *Depo. of Pl.* [#60-1] at 105-07. Plaintiff testified at his deposition:

Q       Okay. At any time that you're interacting with Officers Jossi and Valentine, did you tell them that you were a photo journalist?

A       Yeah. Yes.

Q       When was the first time that you conveyed that information to them?

A       Probably as soon as they were walking me down the stairs, because I was mad that they had shot me in the eye for taking pictures.

Q       What makes you think that someone shot you in the eye for taking pictures?

A       Because I had a camera and when I looked at that person, he shot me in the eye.

Q       So where was the camera when you were shot?

A       On my shoulder, so I can grab it.

Q       Okay. So like on – how was it – on your shoulder, what does that mean?

A       I usually have it over my shoulder and then I have my backpack strap so in case it falls it catches on my backpack.

Q       So the camera has like a strap attached to it?

A       Yeah. I had it in my hand.

Q       Okay. All right. So do you believe that at the moment you were shot your camera was visible?

A       Oh, yeah.

Q       How?

A       I mean, it's a camera. They seen me taking pictures with it.

Q       Who saw you taking pictures?

A       I mean, multiple police.

Q       Okay. Do you have any basis to believe that Officer Valentine saw you take a picture with your camera at any time?

A       Did he see me?

Q       Correct.

A       Did he see me take a photo?

Q       Right. Do you have any basis to believe that Officer Valentine saw you take a picture with your camera at any time on June 1st or June 2nd of 2020?

. . .

A       I honestly couldn't recall because I don't know where he was until he was in front of me.

Q       I understand that. But you didn't observe him see you take a picture, correct?

A       Not to my recollection. I couldn't say either way.

*Depo. of Pl.* [#60-1] at 105-07.

There is no evidence that either Defendants Valentine or Defendant Jossi observed Plaintiff taking photographs. However, although the precise timeline here is unclear, Plaintiff's testimony evinces that his camera would have been obviously visible to anyone looking directly at him. Whether Defendants Valentine and Jossi *actually* saw the camera before any force, or at least some of the force, was taken is less clear. Nevertheless, "[m]otivation is a question of fact." *Cillo v. City of Greenwood Village*, 739 F.3d 451, 463 (10th Cir. 2013). Here, a reasonable jury could infer that Defendant

Valentine and/or Defendant Jossi saw the camera and took action against Plaintiff because of it, particularly as there is no evidence that either Plaintiff or anyone in his immediate vicinity was engaging in violence or destruction at the time of his encounter with Defendants Valentine and Jossi.

Accordingly, the Court finds that there is a genuine issue of material fact regarding the third element of Plaintiff's First Amendment claim.

### c.    Clearly Established Law

To survive the second prong of the qualified immunity analysis, a plaintiff must show that "the constitutional or statutory rights the defendant[s] allegedly violated were clearly established at the time of the conduct at issue." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534-35 (10th Cir. 1995)). This means that the plaintiff must identify "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011) (citation omitted). The decision need not be "precisely on point," *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018), but the Court may not "define clearly established law at too high a level of generality" either. *City of Tahlequah*, 595 U.S. at 12 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks omitted) (quoting *Wesby*, 583 U.S. at 63). This means that, "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that

their conduct is constitutionally or statutorily unlawful." *Frasier v. Evans*, 992 F.3d 1003, 1015 (10th Cir. 2021) (citing *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (per curiam)).

The Court finds that Defendants Valentine and Jossi are entitled to qualified immunity on Plaintiff's First Amendment claim because Plaintiff has not directed the Court's attention to any case demonstrating "the contours of a right that are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Frasier*, 992 F.3d at 1014. The key factor here is the undisputed fact that there was an emergency curfew in place which restricted anyone's presence on the streets with the relevant exception of "credentialed members of the news media." *See* [#59-2] at 2. There is no dispute that Plaintiff was not a "credentialed member of the news media," even if he was otherwise exercising his First Amendment rights as a freelance journalist. Plaintiff has directed the Court's attention to no case clearly establishing that a non-credentialed member of the news media is able to exercise his right to freedom of the press despite a curfew order clearly stating that only credentialed members of the news media were permitted on the streets.[9] The cases cited by Plaintiff are inapposite. *Fogarty v. Gallegos*, 523 F.3d 1147, 1159-62 (10th Cir. 2008), to the extent Plaintiff may be asserting its relevance here, does not concern First Amendment jurisprudence at all. *Response* [#70] at 21. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289-92 (10th Cir. 2008), although including a First Amendment claim, did not concern the exercise of that right in the context of a curfew order, and neither do the other cases cited by Plaintiff. *Response* [#70] at 22 (citing *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir.

---

[9] Plaintiff has not asked the Court to determine whether the curfew order in place the night of the incident was itself unconstitutional and, indeed, this is one of the claims at issue in the *Epps* class action case. *See Epps v. City and County of Denver*, No. 20-cv-01878-RBJ.

2007); *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)). In short, even otherwise assuming a constitutional violation, Defendants Valentine and Jossi would not have "had fair notice" that their conduct of taking action against an uncredentialed reporter was unlawful under these circumstances. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (noting that an officer should not be subject to liability if, at the time of the alleged conduct, the law did not give fair notice of the contours of an asserted right).

Accordingly, the Motion [#59] is **granted** to the extent that summary judgment shall enter in favor of Defendants Valentine and Jossi on Plaintiff's First Amendment claim.

### 2.      Claim Two: Fourth Amendment

Plaintiff's Fourth Amendment claim against Defendants Jossi and Valentine is based on their purported use of excessive force on Plaintiff. *See Am. Compl.* [#27] ¶ 158. The excessive force Defendant Jossi purportedly engaged in occurred when she pulled out her handgun and shouted at Plaintiff, "Put your fucking hands up or I'll fucking kill you!", even though his hands were already up. *Response* [#70] at 14. The excessive force Defendant Valentine purportedly engaged in occurred when he shot Plaintiff in the face with PepperBalls as Plaintiff was walking up the stairs and then again in the back as Plaintiff laid down with his hands up, submitting to his arrest. *Id.*

The Court has reviewed the garage camera video, on which both parties rely and the authenticity of which is not disputed. *See generally Pl.'s Ex. 18, Garage Video* [#64-18, #67]. The Court must view the summary judgment facts in the light depicted by the video. *Scott*, 550 U.S. at 380. In other words, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it," and the Court will not accept facts "clearly contradicted by the footage." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). This

means that while a court considering a summary judgment motion based on qualified immunity "'usually' must' adopt [ ] . . . the plaintiff's version of the facts,' that is not true to the extent that there is clear contrary video evidence of the incident at issue." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (quoting *Scott*, 550 U.S. at 378-80); *see also Harper v. Rose*, No. 1:09-CV-153-TC, 2012 WL 1150463, at *4 (D. Utah April 5, 2012) ("If a videotape of the incident is in the record, anything depicted in the video that contradicts and makes unbelievable the plaintiff's characterization of the incident overrides the conflicting testimony."). "If, however, the video 'depict[s] much of the encounter, but [leaves] open questions about the degree of [the defendant's] resistance to arrest and the timing and extent of force levied by' the officers, a genuine issue of material fact exists." *Harper*, 2012 WL 1150463, at *4 (quoting *White v. Martin*, 425 F. App'x 736, 743 (10th Cir. 2011)).

### a.    Defendant Jossi

The Court begins with Plaintiff's excessive force claim against Defendant Jossi. In Exhibit 18 [#64-18, #67], the garage camera footage, the Court makes the following observations. At about 50:07, Plaintiff first comes into view from the right of the camera. He is walking fairly briskly, and his left hand is in the air, with his elbow at about a ninety degree-angle. His right hand and arm cannot be seen as his head or body is blocking it. After about two or three steps, at about 50:09, he lowers his left hand to his body. His back is to the camera at this point. At 50:10, his left hand lowers further down to his waist level, and his right elbow is up, although it is difficult to see where his right hand is. After taking a couple more steps and slowing down, at about 50:12 he starts to crouch over, and his hands do not appear to be raised. At 50:14, he is kneeling, with his left arm out in

front of him. At 50:15, his backpack is coming off and he is setting it on the ground. At 50:16, Plaintiff remains on his knees but otherwise straightens up to, it appears, possibly take off his jacket. At that time, a streak of white dust hits the ground to his immediate left. Although blurry, it does not appear to hit him directly given that the streak begins a couple of feet behind him and continues to about a foot in front of him, although some of the white dust clearly gets on Plaintiff's lower legs. At 50:17, Plaintiff spreads his arms out wide and leans forward. By 50:20 he is lying face down on the ground with his hands on the ground above his head.

Meanwhile, at 50:19, Defendant Valentine appears, coming from further within the parking garage and walking toward Plaintiff with something held out in his hands. He reaches Plaintiff at about 50:23, when Plaintiff lifts his head. At 50:23, Defendant Jossi first appears coming from the right from inside of the parking garage. Although the quality of the video makes it impossible to tell whether she has anything in her hands, such as her handgun, the video is clear that her arms are not raised and that she is not pointing a gun or other weapon at Plaintiff. There is an issue of fact regarding whether Defendant Jossi ever pointed her handgun at Plaintiff. *See Depo. of Pl.* [#59-3] at 97:16-99:15, 100:4-20, 103:9-14, 116:1-4; *Depo. of Valentine* [#59-4] at 107:18-23; *Depo. of Jossi* [#60-2] at 107:17-109:6. However, even viewing the facts in a light most favorable to Plaintiff, by the time Plaintiff was lying face down on the ground with his hands on the ground above his head at 50:20 and when Defendant Jossi lowered her gun no later than 50:23, at most three seconds had elapsed. Similarly, at most, six seconds had elapsed between the time when Plaintiff was kneeling with both of his hands up at 50:17 and when Defendant Jossi lowered her gun no later than 50:23. There is no evidence on the video that Defendant

Jossi raised her gun and pointed it at Plaintiff at any time after she enters the video frame while Plaintiff is being cuffed.

"When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment.'" *Vette v. K-9 Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "To maintain an excessive force claim, [p]laintiffs must show the [d]efendants' use of force was objectively unreasonable under the circumstances." *Packard v. Budaj*, 86 F.4th 859, 865-66 (10th Cir. 2023) (citations omitted). The Court must "assess[ ] the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Buck*, 549 F.3d at 1287-88. "Our inquiry is holistic—weighing the totality of the circumstances—and objective, disregarding officers' subjective underlying intent or motivation." *Packard*, 86 F.4th at 866 (internal quotation marks and citations omitted).

In making this assessment, the Court considers three guiding factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This test is used regardless of whether probable cause exists for the arrest itself. *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) ("[I]n a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.").

Considering the first *Graham* factor, i.e., the severity of the crime at issue, the Court asks "whether and what kind of offense [the plaintiff] allegedly committed, with an eye toward assessing whether the force used was proportionally reasonable." *Packard*, 86 F.4th at 866; *see Graham*, 490 U.S. at 396. In other words, "[t]he first factor will weigh against officers where the force deployed exceeded the minimal force that would be proportional to the crime involved." *Packard*, 86 F.4th at 866 (citation and internal quotation marks omitted). Here, although Plaintiff was attempting to avoid arrest for being out under the curfew, the crime at issue—violation of the curfew—was minor, and the charges were later dismissed. *See Graham*, 490 U.S. at 396; *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016) (stating that "[a] minor offense—at most—support[s] the use of minimal force"); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (explaining that a misdemeanor committed in a "particularly harmless manner . . . reduces the level of force that [is] reasonable for [an officer] to use"). The Court therefore finds that this factor clearly weighs against the use of significant force.

Considering the third *Graham* factor, there is no evidence that Plaintiff actively resisted arrest. *See Graham*, 490 U.S. at 396. Further, although Plaintiff concedes that he was attempting to avoid arrest, there is no evidence that he was actively attempting to flee from Defendants once ordered to stop. *Response* [#70] at 15 (stating that "Plaintiff was attempting to avoid arrest for under the curfew" [sic]). The Court therefore finds that this factor weighs against the use of significant force.

Returning to the second *Graham* factor, i.e., whether the suspect poses an immediate threat to the safety of the officers and others, this factor is "undoubtedly the most important." *Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) (internal

quotation marks and citation omitted). In making this assessment, the Court "asks whether the facts, viewed in the light most favorable to the non-movant, support a finding that the [plaintiff] here posed an immediate threat to the safety of officers or others." *Packard*, 86 F.4th at 866. Usually, "the question of whether officers reasonably believed a subject presented any threat is a genuine issue of fact for the jury to determine." *Id.* (internal quotation marks and citation omitted).

Here, the Court finds that this factor does not weigh in favor of the use of *significant* force but that it does weigh in favor of some use of force. As noted, Plaintiff was undisputedly out after curfew and attempting to evade arrest. He had been meandering through the parking garage with no known business at the time he was detained, and he continued to walk until just a few seconds before he laid on the ground. Far less than a minute passed after Plaintiff was detained and before he was handcuffed, and it was unknown whether he had any weapons or whether his business on the parking garage property was malignant or benign. *See Buck*, 549 F.3d at 1287-88 (stating that the Court must "assess [ ] the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances").

Based on the Court's consideration of the *Graham* factors, the Court finds that no more than minimal force was permitted in effectuating Plaintiff's arrest. The Court next turns to its consideration of the amount of force used on Plaintiff.

Although the parties have not directly argued the issue, the Court first notes that there has been no evidence presented that Plaintiff was injured, either physically or emotionally, by Defendant Jossi brandishing her weapon. *See Wilkins v. Gaddy*, 559 U.S.

34, 37 (2010) (stating that "[t]he extent of injury may . . . provide some indication of the amount of force applied"); *United States v. Rodella*, 804 F.3d 1317, 1328-29 (10th Cir. 2015) (stating that there is no "de minimis injury requirement for Fourth Amendment excessive force claims in cases which involve more than handcuffing"); *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional.").

Plaintiff cites cases demonstrating that pointing a firearm directly at a person may constitute excessive force. *Response* [#70] at 15-16. In *Holland ex rel. Overdorff v. Harrington*, 268, F.3d 1179, 1192-93 (10th Cir. 2001), a case involving pointing a firearm at children, the Tenth Circuit stated:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. "These are the very ingredients relevant to an excessive force inquiry." *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992). Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

In *Maresca v. Bernalillo County*, 804 F.3d 1301, 1313-14 (10th Cir. 2015), the plaintiffs had presented evidence that officers had pointed loaded guns directly at two parents and their children even after they had fully complied with the officers' orders. The Tenth Circuit found that such conduct could support an excessive force claim. *Maresca*, 804 F.3d at 1314.

The present case is not like *Holland* or *Maresca* given the indisputable timeline shown by the garage camera video. At most, Defendant Jossi pointed a firearm at Plaintiff

for a few seconds, and once he had submitted to arrest by lying on the ground, she lowered her firearm. This is also not a case like *McCowan v. Morales*, 945 F.3d 1276, 1286 (10th Cir. 2019), where excessive force was allegedly used after the arrestee was handcuffed and despite the non-threatening arrestee's compliance. . *See, e.g.*, *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1061-62 (D. Colo. Mar. 31, 2021) (distinguishing *McCowan* on the basis of whether the arrestee was handcuffed); *see also Grass v. Johnson*, 322 F. App'x 586, 590 (10th Cir. 2009) (holding that excessive force and the reasonableness of the defendant officer's actions were questions for the jury where the officer purportedly used force against a cooperative arrestee after he had been handcuffed). In other informative cases, the use of force was *much* greater than that used against Plaintiff here. *See, e.g.*, *Casey*, 509 F.3d at 1279-80 (involving an unrestrained, non-fleeing, non-dangerous misdemeanant who was tackled, tased, and beaten); *Dixon v. Richer*, 922 F.2d 1456, 1462 (10th Cir. 1991) (involving an investigative stop of a plaintiff not suspected of committing a crime where officer kicked him, hit him in the stomach with a metal flashlight, choked him, and beat him). These cases hold that, even viewing the facts in a light most favorable to Plaintiff, Defendant Jossi was constitutionally permitted to utilize the minimal force she used to restrain Plaintiff prior to being handcuffed. The Court is unaware of any case where this level of force has been found to be a constitutional violation. In short, "Plaintiff was unrestrained and [Defendant Jossi] was entitled to use some force to effectuate the arrest." *Sexton*, 530 F. Supp. 3d at 1063 (citing *Graham*, 490 U.S. at 396).

Even viewing the scant evidence in a light most favorable to Plaintiff, the Court finds that there is no genuine issue of *material* fact and that no reasonable jury could find

that Defendant Jossi used excessive force against Plaintiff in violation of his Fourth Amendment rights based on her pointing a handgun at Plaintiff prior to his submission to arrest. *Graham*, 490 U.S. at 396 (stating that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment") (internal quotation marks and citation omitted); *A.M. v. Holmes*, 830 F.3d 1123, 1151 (10th Cir. 2016) (stating that officers have the right to use some degree of physical coercion to effect an arrest). Thus, the Court finds that Defendant Jossi is entitled to qualified immunity on this claim.

Accordingly, the Motion [#59] is **granted** to the extent that summary judgment shall enter in Defendant Jossi's favor regarding Plaintiff's excessive force claim to the extent asserted against her.

### b.    Defendant Valentine

Without providing any relevant legal authority in support, the entirety of Defendants' argument in the Motion [#59] regarding whether Defendant Valentine committed excessive force is that Plaintiff's facts sometimes contradict themselves and that the weight of the evidence favors entry of summary judgment in favor of Defendant Valentine. *See Motion* [#59] at 17. Defendants do *not* argue in connection with this claim that there is no genuine issue of material fact, the hallmark consideration on a motion for summary judgment. *See generally id.*; Fed. R. Civ. P. 56(a). Given this lack of argument, and the Court's general review of the parties' evidence, the Court finds that this is a classic situation where conflict in the factual record must be resolved by the trier of fact rather than by dispositive motion. *See Clemmons v. FC Stapleton II, LLC*, 485 F. App'x 904, 909 (10th Cir. 2012) (stating that the existence of material factual disputes implicates issues

of credibility which cannot be resolved on summary judgment and must ultimately be resolved by a jury).

In addition, the Court cannot find that, taking the facts in a light most favorable to Plaintiff, the law was not clearly established that Defendant Valentine used excessive force on Plaintiff. In *Packard v. Budaj*, the Tenth Circuit recently held that the law was clearly established by 2008 that "the use of less-lethal munitions—as with any other type of pain-inflicting compliance technique—is unconstitutionally excessive force when applied to an unthreatening protester who has neither committed a serious offense nor attempted to flee." 86 F.4th at 869 (internal quotation marks omitted) (relying on *Fogarty*, 523 F.3d at 1159-62; *Buck*, 549 F.3d at 1289-92). The Court, therefore, finds that Defendant Valentine is not entitled to qualified immunity based on his use of PepperBalls on Plaintiff who, as discussed above in connection with the *Graham* factors, had not committed a serious offense, was unthreatening, and was not actively attempting to flee. Thus, qualified immunity is inappropriate.

Accordingly, the Court **denies** the Motion [#59] to the extent Defendant Valentine seeks entry of summary judgment in his favor on Plaintiff's Fourth Amendment excessive force claim.

### 3.    Claim Three: Failure to Intervene

Here, Plaintiff asserts that Defendant Jossi failed to intervene to stop Defendant Valentine's use of force against Plaintiff. *See Am. Compl.* [#27] ¶ 164.

"[A] plaintiff can maintain a claim for failure to intervene only when some other officer used excessive force." *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty., Okla.*, 978 F.3d 1165, 1175 (10th Cir. 2020). Here, for purposes of the present Motion [#59], the

Court has found that there is a genuine issue of material fact regarding whether Defendant Valentine used excessive force on Plaintiff. Thus, if a jury were to find in favor of Plaintiff on that issue, the only additional question here would be whether Plaintiff has adequately alleged that Defendant Jossi violated Plaintiff's Fourth Amendment rights by failing to intervene to stop Defendant Valentine's alleged use of excessive force.

"It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983." *Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011). "Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for [her] nonfeasance." *Id.* "In order to be liable for failing to intervene, the officers must have observed or had reason to know of a constitutional violation and have had a realistic opportunity to intervene." *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (internal quotation marks and brackets omitted).

Here, without specific citation to the record, Defendants argue that summary judgment in their favor is appropriate because Defendant Jossi did not have a reasonable opportunity to intervene to prevent Defendant Valentine's alleged use of force. *Motion* [#59] at 13-14. The Court finds that the record before it is insufficient to find as a matter of law that Defendant Jossi did not have the opportunity to intervene. The precise timeline of events is simply unclear, including precisely where Defendant Jossi was in relation to Defendant Valentine when the alleged instances of excessive force occurred. Too much of the underlying factual predicate occurs outside of any video evidence, and, based on the limited information provided by the parties, there is a genuine issue of material fact

regarding where Defendant Jossi was located in relation to Defendant Valentine at any given relevant time.

Further, in *Fogarty*, 523 F.3d at 1164, the Tenth Circuit Court of Appeals held that officers could be held liable for failing to intervene where the excessive force occurred over the course of three-to-five minutes. Here, Defendant Valentine's actions (whether or not they constituted excessive force) appear to have occurred over the course of at least several minutes in two nearby locations. Thus, depending on how the facts come out at trial, a reasonable jury *may* be able to find in favor of Plaintiff on his failure-to-intervene claim against Defendant Jossi.

In addition, the Court cannot find that, taking the facts in a light most favorable to Plaintiff, that the law was not clearly established that Defendant Jossi had a duty to intervene to stop Defendant Valentine's alleged use of force on Plaintiff. *See, e.g.*, *Fogarty*, 523 F.3d at 1159-62 (regarding use of excessive force); *Mick v. Brewer*, 76 F.3d 1127, 1136-37 (10th Cir. 1996) (holding that "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983" where that officer "observed the interaction and failed to intervene" despite having the time to do so). Thus, qualified immunity is inappropriate.

Accordingly, the Motion [#59] is **denied** to the extent Defendant Jossi seeks entry of summary judgment in her favor on Plaintiff's Fourth Amendment failure-to-intervene claim.

## B.   Municipal Liability

At the outset, the Court notes that the precise bases for the *Monell* claims asserted by Plaintiff against the City and County of Denver are muddled. In part, this is because

the parties' submissions do not clearly identify which allegations in the Amended Complaint [#27] and facts presented in the summary judgment briefing are meant as background information and which are meant to be the bases for the *Monell* claims. In general, these claims are that the City and County of Denver's policies and/or customs caused Plaintiff's injuries, and that the City and County of Denver's failure to properly train officers caused Plaintiff's injuries. *See generally Response* [#70] at 22-26.

There are three primary locations where events underlying this lawsuit occurred on the evening of June 1, 2020: (1) in and around Lincoln Park; (2) at Quiznos near the intersection of 13th Street and Grant Street; and (3) the parking garage on Lincoln Street. There is no evidence that Plaintiff encountered Defendants Valentine and Jossi anywhere other than at the parking garage on Lincoln Street. The briefing renders clear that the events that occurred in the parking garage are part of the *Monell* claims. However, beyond some broad statements generally criticizing officer actions the night of June 1, 2020, statements which could encompass everything occurring that evening, the only mention of any *specific* events in Plaintiff's Response [#70] discussing the *Monell* claims are those that occurred in connection with Defendants Valentine and Jossi. *See generally Response* [#70] at 22-26. There is simply no clear mention of Lincoln Park or the events occurring near Quiznos in Plaintiff's *Monell* discussion, despite Defendants specifically raising those events in the Motion [#59].

Nevertheless, the Court construes Plaintiff's *Monell* claims to extend to the events in Lincoln Park and near Quiznos solely with respect to Plaintiff's First Amendment claim. Plaintiff's discussion elsewhere in his Response [#70] regarding his Fourth Amendment excessive claim and Fourth Amendment failure-to-intervene claim do not address or even

refer to any events occurring prior to the parking garage.[10] *See Response* [#70] at 14-17. In contrast, Plaintiff's First Amendment discussion, while focusing on the events in the parking garage, does mention the events occurring earlier in the evening at Lincoln Park and near Quiznos. *See id.* at 19.

Thus, the Court construes Plaintiff's *Monell* claims as follows: (1) violation of First Amendment rights at Lincoln Park based on policies and/or customs promulgated by the City and County of Denver; (2) violation of First Amendment rights at Lincoln Park based on a failure to train by the City and County of Denver; (3) violation of First Amendment rights near Quiznos based on policies and/or customs promulgated by the City and County of Denver; (4) violation of First Amendment rights near Quiznos based on failure to train by the City and County of Denver; (5) violation of Fourth Amendment right to be free of excessive force in connection with Defendant Valentine's actions at the parking garage based on policies and/or customs promulgated by the City and County of Denver; (6) violation of Fourth Amendment right to be free of excessive force in connection with Defendant Valentine's actions at the parking garage based on a failure to train by the City and County of Denver; (7) violation of Fourth Amendment right to be free of excessive

---

[10] The Court notes that Defendants' argument relating to possible Fourth Amendment violations at Lincoln Park or near Quiznos is, mildly stated, extremely thin. *See Motion* [#59] at 11-12; *Reply* [#74] at 9. In fact, Defendants only provide two unadorned arguments. *See Motion* [#59] at 11-12; *Reply* [#74] at 9. Defendants state that the claim fails because "Plaintiff was not physically touched during [the] encounter," and, relatedly, because "Plaintiff did not submit to the officers' show of authority in either instance." *Motion* [#59] at 12. In support, Defendants cite *Hanson v. Larimer County Board of County Commissioners*, No. 20-cv-00317-RBJ, 2021 WL 2550162, at *4 (D. Colo. June 22, 2021), and *California v. Hodari D.*, 499 U.S. 621, 626 (1991). As discussed in *Hanson*, the United States Supreme Court held: "To constitute a seizure of the person, just as to constitute an arrest—the quintessential 'seizure of the person' under Fourth Amendment jurisprudence—there must be *either* the application of physical force, however slight, or, where that is absent, submission to an officer's 'show of authority' to restrain the subject's liberty." *Hanson* 2021 WL 2550162, at *4 (quoting *Hodari D.*, 499 U.S. at 626). However, given that Plaintiff did not respond to these arguments, and given that the Court can find no clear indication that such claims have even been made, the argument appears to be moot.

force in connection with Defendant Jossi's actions at the parking garage based on policies and/or customs promulgated by the City and County of Denver; (8) violation of Fourth Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on a failure to train by the City and County of Denver; (9) violation of Fourth Amendment rights based on a failure to intervene by Defendant Jossi at the parking garage based on policies and/or customs promulgated by the City and County of Denver; and (10) violation of Fourth Amendment rights based on a failure to intervene by Defendant Jossi at the parking garage based on a failure to train by the City and County of Denver.

The Court reiterates how inappropriate it is to force the Court to determine precisely what claims are being asserted against whom and on what specific basis, particularly with such experienced attorneys on both sides of the litigation. Broad statements regarding wrong-doing and broad arguments regarding why summary judgment should or should not be granted are unhelpful, a disservice to the clients, and delay rulings by the Court as it navigates the parties' filings to determine what claims are actually being asserted and what the basis of each claim is. Indeed, even pro se litigants are required to explain each legal claim and the factual basis for each claim when stating their claims in a complaint: "[T]o state a claim in federal court, a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). "After all, these are, very basically put, the elements that enable the legal system to get weaving—permitting the defendant sufficient notice to begin preparing its defense

*and the court sufficient clarity to adjudicate the merits*." *Id.* (emphasis added). It is equally true when adjudicating motions for summary judgment that the Court must have sufficient clarity as to what the specific claims are and the basis for each one of those claims before it can adjudicate those claims on the merits.

The City and County of Denver is a local government which cannot be sued under 42 U.S.C. § 1983 on a theory of respondeat superior. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978). Rather, entities like the City and County of Denver can be sued directly only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690 (footnote omitted). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

A municipal liability claim is comprised of two elements of proof: (1) a municipal employee committed a constitutional violation; and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). As to the first element, the Court has held, as discussed at length above, that there was no constitutional violation with respect to the Fourth Amendment excessive force claim against Defendant Jossi. *See supra* § III.A.2.a. Thus, the City is entitled to summary judgment in its favor on items (7) and (8) above, i.e., violation of Plaintiff's Fourth Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on policies and/or customs promulgated by the City and County of Denver, and violation of Plaintiff's Fourth

Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on a failure to train by the City and County of Denver. *See Jiron*, 392 F.3d at 419 n.8 ("[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation—i.e., the first step of the qualified immunity analysis—a finding of qualified immunity *does* preclude the imposition of municipal liability.") (emphasis in original).

Regarding the remainder of the *Monell* claims, Defendants provide a thorough overview of municipal liability law. *See Motion* [#59] at 19-21. Their actual argument, however, consists of a blend of exceedingly broad statements and legally incorrect statements, with no supporting legal authority whatsoever. *See id.* at 21-22. The entirety of their argument is as follows:

> Denver faced an unprecedented circumstance with the George Floyd Protests. Never before had DPD faced a combination of protests along with individuals engaged in significant property destruction and violence towards responding police officers. Given the unprecedented nature of the activities occurring in Downtown Denver during the protests, DPD faced significant logistical, operational, and tactical challenges.
>
> Within the context of the George Floyd protests, Plaintiff was arrested for violating the Curfew, and his claims arise from the events leading up to his Curfew arrest. As outlined above, Officer Jossi has not located any specific and particularized precedent finding a constitutional violation where an officer pointed a firearm at an arrestee for a brief period of time in connection with a lawful arrest, with the underlying factual context involving a large-scale protest with unprecedented levels of violence and property destruction, and then quickly holstering the firearm upon obtaining the arrestee's compliance. Officer Valentine is unaware of specific and particularized precedent finding a constitutional violation where the officer discharged [P]epper[B]alls at a wall while pursuing a group of individuals armed with probable cause the group was violating the law. Because it is not clearly established the actions of Officer Valentine and Officer Jossi in the minutes leading up to Plaintiff's arrest violated the Fourth Amendment, or any other Constitutional provisions, Denver was not, and could not, have been deliberately indifferent to any widespread custom or training deficiency resulting in a violation.

*Id.*

Defendants' argument appears to entirely misconstrue the law in this area. Qualified immunity law encompasses the question of whether a constitutional violation was "clearly established." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). However, municipalities are not entitled to qualified immunity, *see Owen v. City of Independence, Missouri*, 445 U.S. 622, 650 (1980), and therefore the "clearly established" issue is irrelevant. Defendants' argument here only addresses whether precedent clearly establishes any constitutional violations such that the City and County of Denver would be on notice and therefore be purportedly deliberately indifferent to any policies, customs, or training failures. *Motion* [#59] at 21-22. This argument is simply inapplicable to municipal liability claims.

Defendants attempt to course-correct in their Reply [#74] (filed by a different attorney) by raising a host of new arguments for the first time with respect to the *Monell* claims. *See Reply* [#74] at 11-15. In part, many of these arguments are still too broadly stated, although likely this partially stems from Plaintiff's prior failure to clearly delineate the basis for each portion of his *Monell* claim. Regardless, arguments raised for the first time in a reply brief are waived. *In re: Motor Fuel Temperature Sales Practices Litig.*, 872 F.3d 1094, 1112 n.5 (10th Cir. 2017). Thus, the Court does not consider Defendants' untimely arguments regarding why the *Monell* claims should be dismissed.

Accordingly, the Motion [#59] is **granted in part** and **denied in part** with respect to the *Monell* claims. The Motion is **granted** with respect to items (7) and (8) above, i.e., violation of Plaintiff's Fourth Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on policies and/or customs

promulgated by the City and County of Denver, and violation of Plaintiff's Fourth Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on a failure to train by the City and County of Denver. The Motion is otherwise **denied** as to the *Monell* claims listed in items (1)-(6) and (9)-(10) above.

## IV. Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that Motion [#59] is **GRANTED in part and DENIED in part**. The Motion is **granted** to the extent that summary judgment shall enter in favor of Defendants on the following claims or portions of claims (1) First Amendment claim as asserted against Defendants Valentine and Jossi; (2) Fourth Amendment excessive force claim asserted against Defendant Jossi; (3) *Monell* claim regarding the purported violation of Plaintiff's Fourth Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on policies and/or customs promulgated by the City and County of Denver; and (4) *Monell* claim regarding the purported violation of Plaintiff's Fourth Amendment right to be free of excessive force in connection with Defendant Jossi's actions at the parking garage based on a failure to train by the City and County of Denver.

The Motion is **denied** with respect to the following portions of Plaintiff's claims: (1) Fourth Amendment excessive force against Defendant Valentine based on his purportedly shooting Plaintiff in the face with PepperBalls as Plaintiff was walking up the stairs and again in the back as Plaintiff laid down with his hands up to be arrested; (2) Fourth Amendment failure-to-intervene claim against Defendant Jossi; (3) *Monell* claim

regarding the purported violation of First Amendment rights at Lincoln Park based on policies and/or customs promulgated by the City and County of Denver; (4) *Monell* claim regarding the purported violation of First Amendment rights at Lincoln Park based on a failure to train by the City and County of Denver; (5) *Monell* claim regarding the purported violation of First Amendment rights near Quiznos based on policies and/or customs promulgated by the City and County of Denver; (6) *Monell* claim regarding the purported violation of First Amendment rights near Quiznos based on failure to train by the City and County of Denver; (7) *Monell* claim regarding the purported violation of Fourth Amendment right to be free of excessive force in connection with Defendant Valentine's actions at the parking garage based on policies and/or customs promulgated by the City and County of Denver; (8) *Monell* claim regarding the purported violation of Fourth Amendment right to be free of excessive force in connection with Defendant Valentine's actions at the parking garage based on a failure to train by the City and County of Denver; (9) *Monell* claim regarding the purported violation of Fourth Amendment rights based on a failure to intervene by Defendant Jossi at the parking garage based on policies and/or customs promulgated by the City and County of Denver; and (10) *Monell* claim regarding the purported violation of Fourth Amendment rights based on a failure to intervene by Defendant Jossi at the parking garage based on a failure to train by the City and County of Denver.

Dated: March 29, 2024                                    BY THE COURT:

                                                         Kathryn A. Starnella
                                                         United States Magistrate Judge