IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:21-cv-02477-DDD-KAS

ALEXANDRA BARBOUR;
BRIANNA BARBER;
JESSICA BEVERAGE;
ROBERT HARR;
CHRISTOPHER HOLLAND;
NALINA INFANTE;
CODY SCHMITT; and
ALEX WOLFSON,

    Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO; and
DOES 1-100, in their individual capacities,

    Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

As in other cities, large-scale protests erupted in Denver following the death of George Floyd at the hands of a police officer. The Plaintiffs in this case were part of those protests, and allege that their constitutional rights were violated in various ways by the response of the City and County of Denver's police department. The City has filed a motion for summary judgment, arguing that Plaintiffs cannot show that City policy caused any of their alleged injuries. That is true for some of Plaintiffs claims, but not all, so the motion is granted in part and denied in part.

- 1 -

EXHIBIT 1

## BACKGROUND

For multiple days, groups of protesters would congregate in and around public spaces to voice their displeasure and opposition to police brutality. Large crowds of protesters often arose and swelled quickly. While the plaintiffs here contend the protests were primarily peaceful, at times, primarily at night, protesters engaged in criminal activity, including starting fires, throwing objects at police officers, causing property damage and endangering public safety.

Soon after the protests began, Denver Mayor Michael Hancock enacted an emergency curfew, prohibiting anyone from travelling the streets and public places of Denver from 8:00 p.m. to 5:00 a.m., except for specific exempt categories. Doc. 70 at 6–7. The parties dispute whether this curfew was targeted, selectively enforced, or otherwise discriminatory against protesters, as opposed to neutrally enforced. Doc. 83 at 6. Denver Division Chief Ron Thomas, who reported to the Chief and Deputy Chief of Police, communicated in text messages that officers were to enforce the curfew only "in relation to protest activity," and only against people engaged in protest-related activity. Doc. 84-32 at 1. He also warned that supervisors that they should "not let officers cite for curfew just for being out after [9:00 p.m.]. Unless they are actively engaged in protest activity some other charge of justification must be used." *Id.* at 4. Internal emails show that officers received "guidance from downtown" that they were only to enforce the curfew with respect to protest activity. Doc. 84-33 at 5.

Denver Police Commander Patrick Phelan was in charge of the City's police response to the protests, and issued daily briefings that governed the actions of Denver Police. Doc. 70 at 5–6. Officers were authorized on a situation-by-situation basis to use 40mm launchers, chemical irritants, pepperball, and pepper spray on protesting crowds in

- 2 -

accordance with standing Denver Police Department policy. Commander Phelan directly authorized the use of force on at least three occasions. Doc. 83 at 22–24.

The Plaintiffs all claim to have been injured by these or similar "less-lethal" munitions used by police during the protests. Each was involved in the protests to some degree, but all were injured under different circumstances.

- Alexandra Barbour says she was struck by projectiles while requesting first-aid for a bleeding man, and inhaled gas from a police gas canister shot into a crowd. Doc. 83 at 10.

- Brianna Barber also claims she was struck by projectiles including rubber bullets, pepperball, and pepper spray, and inhaled gas indiscriminately shot into the crowd. She was holding a "Black Lives Matter" sign, which was also shot by police. *Id.* at 10–11.

- Jessica Beverage was struck by a teargas cannister, which caused lasting pain from the impact, and lasting breathing problems from the gas. *Id.* at 11. She also claims that the next day, while she was handing out food and supplies for homeless people, she was struck with a police baton and pepperballs, and that she was sprayed in the face with bear mace. *Id.* at 12.

- Robert Harr, while standing in a line with other protesters, arms linked, claims to have been hit with a baton and pepper sprayed in the face. *Id.* at 13. He fell to the ground, and was arrested. *Id.* He was later convicted of resisting arrest, because he did not (or could not) release his backpack while being arrested. *Id.*

- Christopher Holland was protesting near the Denver Capitol Building, holding a "Black Lives Matter" sign, when he was shot in the groin and legs. He also recounts being shot in the wrist while holding his sign above his head, causing substantial and lasting pain that required medical treatment. *Id.* at 14.

- Nalina Infante claims she was shot by multiple pepperballs and exposed to large amounts of teargas. *Id.* On another occasion, she was hit in the thigh by a large projectile while trying to cover a tear gas cannister with a traffic cone. *Id.* at 15.

- Alex Wolfson claims he was watching a large group of protesters get shot at by police with gas and rubber bullets when one of the

officers shot him in the eye, blinding that eye. *Id.* at 17. His eye required surgery and follow-up care. *Id.*

- Cody Schmitt was leaving a protest at night, filming and walking behind a group of other protesters, when police shot teargas and flash-bangs at them. *Id.* He was then handcuffed while looking for his glasses (which he had removed due to the gas) sprayed directly with another chemical irritant, and arrested for violating curfew. *Id.* at 16.

None of the Plaintiffs heard officers issue them warnings before deploying force, and although some of the Plaintiffs witnessed criminal activity interspersed among the protesters, none were participating in that activity when they were injured. Plaintiffs have not been able to identify the specific officers who caused their injuries.[1]

The parties dispute the extent of the training that Denver provided to its police officers on mass protests. Doc. 92 at 10–11; Doc. 83 at 18. But it is undisputed that the officers were not required to turn on their body cameras at any specific points during protests. Doc. 83 at 20. Nor did Denver require its officers to complete use-of-force statements when using less-lethal force until it was ordered to do so by a federal judge. *Id.* at 21. Although more than a hundred complaints were filed alleging officer misconduct during the protests, only three officers were disciplined, and one was fired. *Id.* at 23.

The Plaintiffs' complaint brought claims under the First, Fourth, and Fourteenth Amendments to the United States Constitution against Denver and 100 unidentified Doe officers. Doc. 1. Many of these claims have been abandoned or "confessed." *See* Doc. 83. But Denver seeks summary judgment on all of Plaintiffs' claims, arguing that the evidence

---

[1] As to the specific circumstances and injuries of each Plaintiff, Denver demurs that it "Admits [Plaintiff] so testified." In spite of this cagey response, Denver generally does not provide contradicting evidence to dispute these narratives, so I treat those facts as undisputed for the purposes of this motion.

- 4 -

cannot support a finding of a municipal policy that violates the constitution. Doc. 70.

## LEGAL STANDARD

The purpose of summary judgment is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145. Where, as here, a moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by demonstrating a lack of evidence for an essential element of the non-movant's claim. *Id.*

In deciding whether the moving party has carried its burden, courts do not weigh the evidence but instead must view it and draw all reasonable inferences from it in the light most favorable to the non-moving party. *Adamson*, 514 F.3d at 1145. Unsupported or conclusory allegations are insufficient to create a genuine dispute of material fact on summary judgment. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, a court

may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

Before getting to the merits of the arguments, it is worth clarifying exactly which claims are still at issue. Plaintiffs ostensibly brought claims against both the City and County of Denver and a group of unidentified officers, but they have since admitted they did not identify any of the Doe officers, never served any officer with the complaint, and no longer pursue claims against them.[2] Plaintiffs have also confessed their excessive force claims brought under the Fourteenth Amendment.[3] What remains are municipal policy claims against Denver under the First and Fourth Amendment. These claims are discussed below, and the record reveals that disputes of material facts prevent summary judgment. Plaintiff Cody Schmitt's claims are addressed separately because of the distinct facts and theories that underly his claims.

### I.  Municipal Policy Claims

To prove a constitutional violation under § 1983 against a municipal entity like Denver, often referred to as a *Monell* claim, Plaintiffs must present "facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Quintana v. Santa Fe Cnty Bd. of Comm.*, 973 F.3d 1022, 1034 (10th Cir. 2020) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). A claim against a municipality must rest on an underlying constitutional deprivation that directly resulted from a

---

[2] Fed. R. Civ. P. 4(m) requires a court to dismiss claims against defendants who are not served within 90 days of the complaint being filed.

[3] Plaintiff Cody Schmitt's Fourteenth Amendment selective-enforcement claim, brought under the equal protection clause, has not been confessed and is addressed below. To the extent he also brought a claim under the due process clause, it has been confessed. Doc. 102 at 9.

- 6 -

municipal policy, practice, or custom; it cannot be based on "an injury inflicted solely by . . . employees or agents." *Monell*, 436 U.S. at 693–94.

A municipality's official policy or custom can be shown by "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policy-making authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, [or] the deliberately indifferent failure to adequately train or supervise employees." *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017); *see also Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

Causation, the second element of a *Monell* claim, typically requires "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. A municipality is not culpable for an act of its employee simply because its policy created "the mere probability" of a constitutional injury. *Bd. of Cnty Com'rs v. Brown*, 520 U.S. 397, 412 (1997). The policy must have made it "highly likely" that "*this* officer" would "inflict the *particular* injury suffered by the plaintiff." *Id.* (emphasis in original). This tight causal connection is occasionally relaxed where the plaintiff alleges "a systemic failure" resulting in a constitutional violation. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (2023). "[E]ven where no individual action by a single officer rises to a constitutional violation, a municipality may be held liable where the sum of actions nonetheless violates the plaintiff's constitutional rights." *Crowson v. Washington Cnty Utah*, 983 F.3d 1166, 1191 (2020).

The third element, deliberate indifference,[4] is satisfied "when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998); *City of Canton*, 489 U.S. at 388 ("The inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

> In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Id.* at 1307-08 (quoting *Brown*, 520 U.S. at 398). But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Denver argues that the Plaintiffs cannot prove the existence of an unconstitutional policy, nor—as it pertains to the first amendment claims—an underlying constitutional violation.

---

[4] Plaintiffs' argument that the deliberate indifference element is only necessary in failure-to-train cases ignores recent Tenth Circuit precedent applying the full three-part test in contexts other than failure-to-train. *See, e.g., Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022); *Hinkle v. Breckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1241–42 (10th Cir. 2020).

- 8 -

### a. Unconstitutional Policy

Denver claims that the Plaintiffs have no evidence of any specific policy that satisfies *Monell*, no matter the type of policy alleged. Denver suggests

- The actions of its officers were not continuing, persistent and widespread enough to constitute a custom;
- Commander Phelan's actions were not those of a final policymaker;
- The failure to discipline theory has been consistently rejected by courts;
- Failure to use body worn cameras or fill out use of force reports are not constitutional violations;
- After-the-fact ratification cannot be unconstitutional without endorsement by a final policymaker;
- Denver was not indifferent to any unconstitutional harm for which it failed to train its officers; and
- Finally, that Plaintiffs Beverage and Harr both suffered their injuries on July 1, after the TRO in a separate case had issued, and Denver's policies had changed.

This laundry list of deficiencies, Denver argues, defeats the *Monell* claims under any theory.

This argument overlooks significant factual disputes that could lead a reasonable juror to conclude that Denver maintained unconstitutional policies. The first suggestion, that the actions of Denver officers were not "continuing, persistent, and widespread," is a perfect example. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). Denver likens Plaintiffs' allegations to "an isolated incident." Doc. 70 at 17 (citing *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996)). But Plaintiffs have alleged and provided evidence that Denver's problems with use of force and protest response stretch back as far 2011, when Denver police clashed with "Occupy" protesters. *See* Docs. 1 at 22; 83 at 19. Plaintiffs argue that Denver was made aware even then that

- 9 -

its officer's actions risked constitutional violations but failed to train them to avoid those risks. Doc. 83-61 at 15.

A reasonable jury could conclude that Denver's informal custom was to allow its officers to fire indiscriminately into crowds of peaceful or mostly peaceful protesters with the added protection of anonymity granted by the failure to deploy body worn cameras or use-of-force reports. Or the jury might find, on essentially the same evidence, that Denver failed to train its officers despite prior knowledge that its protest response practices created an unreasonable risk of at least some officers taking unconstitutional action. A reasonable jury could also find such an informal custom, or a failure to train, caused the Plaintiffs' injuries and that Denver was deliberately indifferent to the risk of unconstitutional retaliation or use of force. Nothing more is needed to deny summary judgment on Plaintiffs' municipal liability claims.[5]

### b. First Amendment

Denver also argues that there is no evidence to show any First Amendment violation. To establish a first amendment retaliation claim, each Plaintiff must have: (1) engaged in protected activity; (2) suffered an injury that would chill protected activity; and (3) been injured by actions substantially motivated by the protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Denver does not dispute at this point whether the Plaintiffs were engaged in protected activity. And it

---

[5] Fed. R. Civ. P. 56(c) provides that summary judgment should only be granted if "there is no genuine issue as to *any* material fact . . ." (emphasis added). Because I find that there are disputed facts as to the informal policy theory and the failure-to-train theory, the claim will be put to a jury, and there is no need to address every possible theory for *Monell* liability in this order. Denver's alternative *Monell* arguments cannot succeed on summary judgment where a jury could find in Plaintiffs' favor on other grounds.

- 10 -

almost goes without saying that a jury could find a reasonable person would be chilled from protesting after being gassed, pepper-sprayed, or indiscriminately shot with rubber bullets while protesting, as Plaintiffs have stated in their depositions happened to them. *See, e.g.,* Doc. 83-38 at 47–48 (Plaintiff Barber expressing her fears of participating in additional protests because of her safety concerns).

Denver does dispute whether individual officers were motivated by individual Plaintiff's protected activity. For that argument to succeed, however, there would have to be no evidence on which a hypothetical jury could find the officers who injured the Plaintiffs were motivated by protest activity. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In fact, there is ample evidence that a jury could do so. Some evidence shows, for example, that Ms. Barber's "Black Lives Matter" sign was shot from her hand and that Mr. Holland was shot in the wrist while also holding a sign above his head.[6] And the Plaintiffs have uniformly stated that there was either zero or minimal criminal activity ongoing at the time they were shot—only peaceful legal protesting.[7] If a jury credits those statements, it could also reasonably infer that the officers were substantially motivated by the protest activity.

Denver's motion focuses almost entirely on the lack of evidence pertaining to individual officers' states of mind, based on an unpublished Tenth Circuit case, *McCook v. Springer Sch. Dist.,* 44 F. App'x 896, 905

---

[6] As discussed below, a jury could also find that officers selectively enforced the curfew against protesters.

[7] Denver argues quite callously that any injuries sustained by the Plaintiffs are based on "their own inappropriate actions or because of inadvertence resulting from the unintended consequence of force directed at those engaging in violent or destructive conduct." Doc. 70 at 13. This is at best a factual dispute with the Plaintiffs, inappropriate for resolution on summary judgment.

- 11 -

(10th Cir. 2002). Putting aside the nonbinding nature of that decision, *McCook*'s "culpable state of mind" standard arose in the context of overcoming qualified immunity, which is not at issue here, and even then, it acknowledged that "proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent." *Id.* (quoting *Poole v. County of Otero*, 271 F.3d 955, 962 (10th Cir. 2001); *see also Hinkle v. Beckham Cnty Bd. of Cnty Comm'rs*, 962 F.3d 1204, 1229 (10th Cir. 2020) ("we must consider surrounding circumstances in evaluating [a] retaliation claim").

The wealth of indirect evidence here and the surrounding circumstances could lead a jury to conclude that Plaintiffs' injuries were substantially motivated by retaliatory intent. Even "knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005). Requiring direct evidence of individualized officers' intent would be particularly unjust in this case, where a key argument is that lax requirements for use-of-force reports and body worn cameras allowed officers to remain anonymous and prevented protesters from identifying them.

Nor is it universally true that municipal liability must rest on an underlying violation attributable to a particular person. An exception exists to that general rule where a municipal policy causes a constitutional violation through the aggregated actions of multiple individuals. *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985) ("Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights."). If Denver's policy caused officers to

retaliate against protesters, it does not matter if the officers themselves were acting with retaliatory intent. Denver cannot shield itself from liability by separating the actions of individual officers from the intentions of its decisionmakers. *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020) ("the municipality may not escape liability by acting through twenty hands rather than two"). If a municipality's policy has an aggregate effect that works a violation of a Plaintiff's constitutional rights, a jury could find it unconstitutional by finding the aim of the policy itself was to retaliate against protected activity. If Plaintiffs can prove, as they allege, that Denver's policy was to use unnecessary force to shut down the expression of even peaceful protesters, that is enough to hold the City liable under the First Amendment, even if no individual officer's action was unconstitutionally motivated. So summary judgment on the first amendment claims is denied.

## II.     Cody Schmitt Claims

Plaintiff Cody Schmitt brings slightly different claims.[8] Mr. Schmitt's equal protection claim under the Fourteenth Amendment and his First Amendment claim stem from his arrest for violating the emergency curfew, which he argues was targeted or selectively enforced against protesters like him because of their First Amendment activity. Denver argues that the curfew was content-neutral, and that its policy was to enforce the curfew against those engaged in criminal acts.

The Equal Protection Clause of the Fourteenth Amendment provides that "no state shall deny to any person within its jurisdiction the equal protection of the laws," and is "essentially a direction that all persons

---

[8] His claims were originally subject to a separate class-action lawsuit and were stayed in this case. Doc. 39. The stay was lifted when Mr. Schmitt opted out of that class-action, and Denver filed a supplemental motion for summary judgment. *See* Docs. 95, 96, 100.

- 13 -

similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (internal quotation marks omitted). To prove his claim, Mr. Schmitt must show that he, a protester, was treated differently from similarly situated non-protesters, and that this difference in treatment was based on impermissible grounds. *United State v. Salazar,* 720 F.2d 1482, 1487 (10th Cir. 1983). Similarly situated individuals are those whose "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. DeBerry*, 430 F.3d 1294, 1301 (10th Cir. 2005) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996). Impermissible grounds for differential treatment include "race, religion, or the desire to prevent the exercise of constitutional right." *Salazar*, 720 F.2d at 1487.

This type of discrimination may be shown "directly or circumstantially." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021). "Direct proof is showing that a distinction between groups of persons appears on the face of a state law or action.*" Id.* But a court may also infer purposeful discrimination, even if the policy is facially neutral, by looking at the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). Mr. Schmitt need only show that Denver chose "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

There is enough evidence in the record to deny summary judgment on this claim. Plaintiffs' evidence includes text messages, emails, and depositions confirming that Denver's policy was to enforce the curfew only against protesters and protest-related activity. This policy was approved by the Chief of Police and came down the chain of command to

- 14 -

officers on the street. Docs. 84-32 at 1; 84-34 at 3; 84-87 at 27. At the same time, the curfew was not enforced (at least not as strictly) against non-protesters. *Id.* One video shows officers arresting protesters on the streets after curfew but making no attempt to arrest a non-protester thanking them for their service, who was similarly out after curfew. Doc. 84-89. Whether this is characterized as direct or circumstantial proof, a jury could find this differential treatment was intended to "prevent the exercise of a constitutional right" and that protesters were targeted "because of" the adverse effects it would have on their rights. *Salazar*, 720 F.2d at 1487; *Feeney*, 442 U.S. at 279.

Denver argues that it based enforcement on destructive activity related to the protests, not on the protest activity itself. If Denver selectively enforced its curfew only against those engaged in other riotous, criminal behavior, that difference in enforcement would not be impermissible: law enforcement is typically entrusted with discretion as to when and against whom it will enforce laws, just so long as that discretion is not used to burden constitutional rights. *U.S. v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("caution is required in reviewing a claim of selective law enforcement."); *see also U.S. v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993).

Denver presents some evidence that its enforcement policy was based on destructive criminal activity, but that evidence is contested. While it is weight on Denver's side of the scale, Mr. Schmitt's evidence stacks up on the other side, and courts do not weigh evidence on a motion for summary judgment. *Adamson*, 514 F.3d at 1145. Whether Denver based its enforcement practices on mere protest activity, as opposed to related destructive activity, must be a question for the jury. The same goes for whether officers knew that Mr. Schmitt, who was with a large group of

protesters and searching for his glasses after being exposed to gas, was himself a protester when he was arrested.

### a. Fourth Amendment

The same does not go for Mr. Schmitt's Fourth Amendment claim, however. While Mr. Schmitt argues that there was no basis for his arrest, neither party can dispute that he was in violation of the curfew. *See* Doc. 108 at 2. The officers who arrested Mr. Schmitt knew he was in violation of the curfew and had probable cause to arrest him. As discussed above, that arrest may have been in violation of the Fourteenth Amendment, but an arrest does not violate the Fourth Amendment where it is supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Mr. Schmitt presents no argument that can overcome that longstanding legal principle.

While Mr. Schmitt points to factual disputes over the exact circumstances, motivations, and timeline that led to his arrest, none of those disputes are *material*, because none of them contradict the key fact that he was in violation of curfew. *See Adamson*, 514 F.3d at 1145 (defining material factual disputes).

It may seem odd to acknowledge that a policy of enforcing a curfew could violate the Fourteenth Amendment, but at the same time hold that a specific arrest was supported by probable cause and does not violate the Fourth Amendment. But a violation of one right is not automatically a violation of another, and Plaintiff's arrest can only be found unconstitutional when combined with the evidence that the curfew was enforced selectively against him. The Fourth Amendment does not guarantee

- 16 -

equal protection, the Fourteenth does. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause . . . ."). Because of that distinction, no material factual dispute precludes resolution of Mr. Schmitt's Fourth Amendment claim, and Denver is entitled to judgment as a matter of law on this claim.

## CONCLUSION

It is **ORDERED** that:

Defendant's First Motion for Summary Judgment, **Doc. 70**, is **GRANTED IN PART** as to Plaintiffs' Fourteenth Amendment Claims, and otherwise **DENIED.** Defendant's Supplemental Motion for Summary Judgment as to Plaintiff Cody Schmitt, Doc. 100, is **GRANTED IN PART** as to Mr. Schmitt's Fourth Amendment Claim, and otherwise **DENIED.** Does 1-100 are **DISMISSED.**

DATED: June 25, 2024        BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge